Case No. 24-3047

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

MICHAEL COLWELL and JULIA COLWELL,
*Petitioner – Appellants*
v.
SIG SAUER, INC.,
*Respondent – Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK

---

**BRIEF OF APPELLANTS –
MICHAEL COLWELL AND JULIA COLWELL**

---

**Saltz Mongeluzzi Bendesky, P.C.,**
Robert W. Zimmerman, Esq.
1650 Market Street, 52 Floor
Philadelphia, PA, 19103
(215) 496-8282
RZimmerman@SMBB.com

*Attorneys for Appellants
Michael Colwell and Julia Colwell*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. ii

I.  STATEMENT OF JURISDICTION .................................................... 1

II.  STATEMENT OF THE ISSUES PRESENTED ................................ 1

III.  STATEMENT OF THE CASE ............................................................ 2

    A.  Factual Background ..................................................................... 3

        1.  The Incident ......................................................................... 3

        2.  The Sig Sauer P320 ............................................................ 5

        3.  Objective Data that the P320 Unreasonably Susceptible to Unintended Discharge. ....................................................... 7

        4.  Other Similar Incidents to Sergent Colwell's Discharge. ............................ 8

        5.  Plaintiffs' Experts ............................................................. 12

            a.  Dr. William Vigilante, Ph.D. ..................................... 13

            b.  James Tertin ............................................................... 24

    B.  Procedural Background .............................................................. 33

        1.  District Court Ruling Presented for Review ..................... 34

IV.  SUMMARY OF THE ARGUMENT .............................................. 38

V.  ARGUMENT ................................................................................... 41

    A.  Standards of Review .................................................................. 41

        1.  Exclusion of Expert Testimony ........................................ 41

        2.  Summary Judgment ........................................................... 42

    B.  The District Court's Improper Ruling is Based on an Incomplete  and Inaccurate Review of the Record .......................................... 43

    C.  The District Court Abused its Discretion in Excluding Plaintiffs' Expert Witness Testimony. ..................................................... 46

        1.  The Record Supports Tertin and Vigilante's Conclusions that an External Safety Would Likely Have Prevented Sergeant Colwell's Unintended Discharge ..................................................................... 47

D.   Even if This Court Finds the Exclusion of the Experts was Not an Abuse of Discretion, Plaintiffs' Claims Still Survive Summary Judgment. ........................55

VI.  CONCLUSION ...................................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........................................................42, 43

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................44

*Argonaut Ins. Co. v. Samsung Heavy Indus. Co.*,
929 F. Supp. 2d 159 (N.D.N.Y. 2013)....................................45

*Armendariz et al. v. Sig Sauer*,
1:22-cv-00536-JL-AJ (D.N.H) ...............................................6

*Bazemore v. Friday*,
478 U.S. 385 (1986)................................................................55

*Beruashvili v. Hobart Corp.*,
No. 05CV1646ENVMDG, 2010 WL 11622750 (E.D.N.Y. July 15,
2010) ........................................................................49, 50, 51

*Burns v. Martuscello*,
890 F.3d 77 (2d Cir. 2018) ....................................................43

*Castaldi v. Land Rover N. Am., Inc.*,
No. 06 Civ. 1008, 2007 WL 4165283 ...................................58

*Colon ex rel. Molina v. BIC USA, Inc.*,
199 F. Supp. 2d 53 (S.D.N.Y. 2001) .....................................49

*Colwell v. Sig Sauer, Inc.*,
No. 1:21-CV-1200 (BKS/ML), 2024 WL 4216047, at *1 (N.D.N.Y.
Sept. 17, 2024)……………………………………………*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) .........................*passim*

*Davis v. Sig Sauer*,
No. 24-5210, 2025 WL 304340 (6th Cir. Jan. 27, 2025) ...........................*passim*

iv

*Davis v. Sig Sauer*,
  No. 3:22-cv-00010-GFVT, 2024 WL 54595 (E.D. Ky. Jan. 4,
  2024) ................................................................................................39, 63

*Figueroa v. Bos. Sci. Corp.*,
  254 F. Supp. 2d 361 (S.D.N.Y. 2003) ...............................................55

*Fleischman v. Albany Med. Ctr.*,
  728 F. Supp. 2d 130 (N.D.N.Y. 2010).................................................43

*In re Fosamax Prods. Liab. Litig.*,
  688 F. Supp. 2d 259 (S.D.N.Y. 2010) ................................................56

*George Abrahams v. Sig Sauer, Inc.*,
  No. Civ. Case No. 220601213 .............................................................42

*Herman v. Sig Sauer Inc.*,
  No. 21-1038, 2023 WL 5827054 (W.D.O.K. Sept. 8, 2023) .....................39, 53

*Jarvis v. Ford Motor Co.*,
  283 F.3d 33 (2d Cir. 2002) ................................................................59

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................46

*Matsushita Electric Co. v. Zenith Radio*,
  475 U.S. 574 (1986)......................................................................44, 58

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir.1995) ................................................................42

*Robert Lang v. Sig Sauer, Inc.*,
  No. 1:21-CV-04196-ELR ...............................................................40, 42

*Voss v. Black & Decker Mfg. Co.*,
  59 N.Y.2d 102, 450 N.E.2d 204 (1983)...............................................59

*Zuchowicz v. United States*,
  140 F.3d 381 (2d Cir. 1998) ...............................................................42

**Statutes**

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1332 ................................................................................1

## I.     STATEMENT OF JURISDICTION

The Order on appeal was entered on September 17, 2024, disposing of only Plaintiff's Strict Product Liability and Negligence claims against Sig Sauer, Inc. ("Sig Sauer" or "Sig"). Plaintiffs timely filed their notice of appeal on October 15, 2024, within the thirty days permitted under F. R. App. P. 4(a)(1)(A). On October 18, 2024, final judgment was entered in favor of Sig Sauer dismissing all of Plaintiffs' claims. Plaintiffs timely filed another notice of appeal on November 18, 2024, within the thirty days permitted under F. R. App. P. 4(a)(1)(A). Appellate jurisdiction derives from 28 U.S.C. § 1291, because this appeal derives from a final decision of the district court. The United States District Court for the Northern District of New York had diversity jurisdiction under 28 U.S.C. § 1332.

## II.     STATEMENT OF THE ISSUES PRESENTED

1.     Whether the district court committed reversible error by granting summary judgment in favor of Sig Sauer by failing to review, acknowledge, or consider Plaintiffs' response to Defendant's statement of undisputed facts, and the arguments contained within, as required by law?

2.     Whether the district court committed reversible error by granting summary judgment in favor of Sig Sauer by excluding the causation opinions provided by Plaintiffs' experts, even though the experts employed reliable, testable, and scientific methodology and analyses on which their opinions were based?

1

**3.**    Whether the district court committed reversible error by granting summary judgment in favor of Sig Sauer based upon the exclusion of Plaintiffs' experts causation opinions only, and where Sig Sauer did not challenge, and the district court did not exclude, Plaintiffs' experts' design-defect opinions demonstrating the P320 is defectively designed, unreasonably dangerous, and uniquely susceptible to unintended discharge?

**4.**    Whether causation is an issue of fact to be determined by the jury in this product liability action where: (1) the jury would hear the admissible and unchallenged design defect opinions by Plaintiffs' experts who explain the function of the P320 and its design flaws, namely its single-action design, short trigger travel, and lack of a tabbed trigger safety or *any* external safeties; (2) there is non-expert record evidence that Plaintiff Michael Colwell's P320 discharged while in its holster and without his finger touching the trigger; and (3) other record evidence corroborates Michael Colwell's testimony that his P320 discharged in its holster and corroborates that the design defects of the P320 caused his injuries.

## III.    STATEMENT OF THE CASE

This case is about a police officer and skilled gun owner, with extensive experience with guns, who was seriously injured by the Sig Sauer P320; a gun that by its specific and intentional design, is different and less safe than every other gun sold by any other gun manufacturer in the world. Every other single-action gun sold

commercially has at least one external safety to prevent unintended discharges. The P320 has none. As a result, the design of the P320 leaves it unreasonably susceptible to unintended discharge, even when secured in holsters specifically designed for the P320. Michael Colwell's duty-issued P320 discharged while secured in its holster without him touching the gun. Plaintiffs' investigation in this case revealed that this phenomenon occurred frequently with the P320 and continues to occur, leaving law enforcement officers across the country maimed and seriously injured due to the design choices by Sig Sauer, and its refusal to include a trigger safety on the P320.

### A. Factual Background

#### 1. The Incident

On June 2, 2021, Plaintiff, Sergeant Michael Colwell was catastrophically injured when his holstered Sig Sauer P320 discharged as he was performing training in connection with his duties as a police officer in the Troy Police Department in New York. *See* Michael Colwell Deposition, A039 at 66:5-67:20. At that point, Sergeant Colwell had been an officer with the Troy Police Department since 2009 and underwent firearms training each year, including training on how to properly carry firearms. *Id.* A026, at 13:9-14:20; A032 at 39:9-13. Sergeant Colwell also underwent qualification training with the Sig Sauer P320 at least four times prior to the subject incident. *See Id.* A028, at 23:15-24:13; 37:7-16. Sergeant Michael Colwell was an experienced firearm user.

3

On June 2, 2021, Sergeant Colwell was engaged in qualification training. *See Id.* A036-A039, at 54:3-67:20. His Sig Sauer P320 was holstered on the right side of his waist, and a simulation taser was holstered on the left side around his pocket area. *See Id.* A038, at 61:15-64:2. Sergeant Colwell testified:

> "….we were doing the scenario was a combination of room clearing and target acquisition, whether it's a lethal threat or a nonlethal.  I had Officer Mike Gordon with me, he was in front of me. During the evolution, he encountered a target that was a nonlethal target….So I said: All right, well I'm the support guy, this is …. So lethal scenario, it's taser time.
>
> **So I took the gun, put it in my holster. As I'm starting to come across my body to get my taser, whether my hand was full blown on my taser or I just about to get there, we heard a bang.**
>
> … At that point I looked down. He sees a hole in my pants and I say -- I think I said, Oh shit, I think I'm hit…."

*See Id.* A039, at 66:5-67:20 (emphasis added).

Sergeant Colwell's P320 was holstered using the Cytac paddle holster, depicted below, as photographed after the incident.  *See Id. at*, 30:10 :31:15.

4



*See* A305. The above photograph clearly demonstrates that the holster does not entirely cover the trigger guard, exposing the trigger guard area and allowing access to the sides of the trigger by a foreign object. A trigger safety protects against unintended trigger actuation by a foreign object. The P320 has no trigger safety, making it unique among its competitors in the striker-fired pistol market.

Sergent Colwell's P320 was found <u>in the holster</u> after the incident. *See* A040, at 72:15-23. Sergeant Colwell never touched the trigger and did not intend for the pistol to discharge. *See* Colwell Dep., A039, at 66:5-67:20; *see also,* Plaintiffs' Complaint, A076, at ¶31-32.

### 2. The Sig Sauer P320

Sergeant Colwell's incident is unfortunately not isolated, but instead, one of **well over 160 incidents** known to Plaintiffs, and likely more than that amount known to Sig Sauer, where the P320 has discharged without the user's finger on the trigger.[1]

---

[1] Plaintiffs' experts considered and relied upon video evidence of this phenomenon where the P320 discharges without the user's finger on the trigger, or even on the gun itself. Plaintiffs included these videos for the district court's consideration at

Several incidents of P320s discharging without the user touching the trigger have been caught on video, and many more have been attested to under penalty of perjury. *See,* OSI Incident Videos, A102; OSI Incident Affidavits, A103-A107; *Bevacqua, et al v. Sig Sauer, Inc.*, Complaint, A673-A683 ¶¶ 80-165 (cataloguing other substantially similar incidents). The vast majority of the victims of the P320 have been highly trained police officers, federal law enforcement agents and/or military veterans who respect firearms and handle them with care. *See, Bevacqua, et al v. Sig Sauer, Inc.*, Complaint A673-683, ¶¶ 80-165. In response to the growing number of incidents, police departments from Wyoming to Philadelphia are replacing the P320 as their standard sidearm since the departments and officers have lost confidence in the defective gun.

The P320 is the only single-action firearm in American history to be commercially produced without any external safety to prevent the trigger from depressing when the user does not intend for it to do so. *See* Deposition of Sean Toner in *Slatowski*, A169, at 14:16-21. In fact, Sig Sauer designed the P320 to have an extraordinarily short single-action trigger pull (about 1/20 of one inch under about 6 pounds of pressure, compared to 2/3 of one inch under 10-15 pounds of pressure for a typical double-action pistol) yet failed to incorporate *any* external

---

summary judgment and includes them for this Court in the instant appeal. *See* Other Similar Incident Videos ("OSI") A102.

safety to prevent the trigger from being unintentionally depressed the fraction of an inch it takes to discharge a round. *See* Expert Report of Dr. Vigilante, A119-A120. For comparison, Glock, Sig Sauer's largest competitor for law enforcement contracts, requires the trigger to be pulled over three times the length of a Sig Sauer P320, **and** incorporates an external safety on every single model sold. Sig Sauer has refused to publicly acknowledge that the P320 is a single-action firearm, despite its experts in this matter admitting that it is. *See* Deposition of Sean Toner in *Slatowski*, A181 at 61:13-23. Sig Sauer's misleading marketing has kept consumers and police departments in the dark about how dangerous the gun is relative to its competitors.

### 3. Objective Data that the P320 Unreasonably Susceptible to Unintended Discharge.

The danger of the P320 relative to its competitors has been proven in the field by data supplied by the United States Immigration and Customs Enforcement agency ("ICE"). In 2019, ICE began a transition from the Glock to the P320. Shortly after beginning the transition, ICE officials noticed an increase in unintended discharges. This prompted an investigation and report by the ICE Office of Professional Responsibility Investigations Division, which produced a memorandum entitled "**Increase in ICE Unintentional Discharges**." *See* ICE Memo A183-A185, *see also* Supplemental ICE Data, A185-A188.

The ICE memorandum notes a significant increase in unintended discharges immediately following the introduction of the P320 among its agents. The report

also includes a list of the unintended discharges within the agency between June 4, 2019, and October 1, 2020, with three of the incidents involving an "unknown" weapon. *Id.,* ICE Memo A183-A184. In fact, each of those three incidents involving an "unknown" weapon actually involved a P320 discharging when the agent swore they did not pull the trigger[2]; bringing the total number of incidents involving the P320 during that 17-month period to 15 (compared to five in 2017 and two in 2018 when ICE was using the Glock pistol with a tabbed trigger).

ICE then produced an additional list of discharges between December 2020 and November 2022 showing **27 confirmed unintentional discharges involving a P320** and 11 unintentional discharges involving an "unknown" weapon. *See* Supplemental ICE Data, A185-A188. Comparing the seven combined unintended discharges in two years when ICE agents were using the Glock pistol with a tabbed trigger, compared with the 26-39 in the 23-month span after ICE agents used the P320 pistol with no tabbed trigger, demonstrates the **P320 is 3.8-5.5x more prone to unintended discharges than the tabbed trigger-equipped Glock.** Plaintiff's experts reviewed and relied upon this data. *See* Vigilante Dep., A507, 33:7-11.

### 4. Other Similar Incidents to Sergent Colwell's Discharge.

Plaintiff obtained videos of other similar incidents to Sergent Colwell's unintended discharge which involved his P320 discharging in its holster without his

---

[2] Each of the three incidents involves an ICE agent who has filed a lawsuit against Sig Sauer.

touching the gun. While Sergent Colwell's incident was not captured on video, other officers who experienced the same phenomenon were lucky enough to have their respective incidents captured on video. Plaintiff obtained six videos from law enforcement officers across the country whose P320ies discharged without their finger touching the trigger, and in nearly all cases, with their gun holstered and their hand nowhere near it. Plaintiff's experts reviewed and relied upon these videos in forming their design defect and causation opinions in this case.

On February 2, 2016, in Roscommon Michigan, Officer Michael Richardson's P320 discharged while in its duty holster while he was getting out of his patrol car. This was captured on his body-worn camera. Immediately after the discharge is heard, the Officer states, "What the hell? Explain to me how a gun goes off getting out of the car?" *See* OSI Videos, A102. He also states that he was glad he got someone as a witness to the discharge. The shell casing did not eject from his gun, as it discharged in its holster. *Id.* Sig Sauer investigated this incident and concluded that a foreign object—a seatbelt buckle—contacted the trigger while the gun was holstered causing it to discharge. *See* Vigilante Dep., A508.

On January 2, 2021, in Milwaukee Wisconsin, an Officer Aaron Roth's P320 discharged while in its holster as he was exiting his vehicle. The gun was holstered on the officer's right hip and he was holding objects in his right hand at the time of discharge. His hand was not on or near the gun. See A102.

9



***Image from A102 of the Moment After Officer Roth's Unintended Discharge***

On August 3, 2021, in St. Clair, Minnesota, an ICE Agent Robert Greene's P320 discharged while the officer was holstering the gun. His trigger finger was clearly off the trigger when holstering the gun when it discharged.



On February 7, 2022, in Honesdale, Pennsylvania, Officer Donald Thatcher's P320 discharged while in its holster as he was exiting his vehicle. His gun was on his left hip and his phone was in his left hand at the time of discharge and nowhere near the gun or holster. *See* A102.

On March 28, 2022, in Houston Texas, Officer Marvin Reyes was placing a bag in the back of his truck, in full uniform, when his P320 discharged while in its duty holster. His gun was on his right hip, and he was reaching into his truck with his right arm. His hand was nowhere near the gun or holster. *See* A102.

On April 6, 2022, in Somerville, Massachusetts, Officer Ashley Catatao was walking to her car with a bag on her right shoulder that had a set of keys on the bag. As she bent down, her P320 discharged in its holster, striking Officer Catatao in the right leg. *See* A102. Officer Catatao testified that her hand was not touching the gun at the time of discharge.

Sig Sauer has admitted that the P320 is responsible for more reported unintended discharges than any other pistol it sells to law enforcement. *See* Farkas Dep., A651, 73:10-17. What is depicted on the OSI Videos, A102, is a defectively designed gun discharging time and again in its holster, without the user touching the trigger. This should never happen, but does, repeatedly due to the design choices of Sig Sauer. Plaintiffs experts do not dispute Sig Sauer's assertion that the gun cannot fire on its own. Accordingly, all of the unintended discharges depicted in the OSI videos represent unintended trigger actuation by a foreign object. Plaintiff's experts identified the design features that make the P320 unique among its competitor striker-fired pistols, and uniquely susceptible to unintended discharge. These design defect opinions also form the basis of Plaintiff's expert's causation opinions that, had

the P320 been designed with necessary safety features like a tabbed trigger safety, Sergent Colwell's incident would not have occurred.

### 5. Plaintiffs' Experts

Plaintiff retained two liability experts: gunsmithing expert James Tertin and human factors and ergonomics expert William Vigilante, Ph.D. Defendant did not challenge the qualifications nor design defect opinions of Plaintiffs' experts. *See* Defendant's Reply In Support of its *Daubert* Motions, A792 ("Plaintiffs spend the overwhelming majority of their opposition discussing why they believe the design of the P320 model pistol is defective. But that is not the aspect of Vigilante's and Tertin's opinions that Sig Sauer challenged in its Rule 702 motion, **which focused narrowly on the unreliability of Vigilante's and Tertin's causation opinions**.") (emphasis added).

Plaintiff experts' design defect opinions were unchallenged at the district court level. They are relevant to the issues in this case, and are admissible at trial. Despite Sig Sauer not challenging Mr. Tertin's qualifications, the district court *sua sponte* determined him to be a qualified firearms expert. *See* Order Granting Sig Sauer's Motion for Summary Judgment, A391, at 6. ("Mr. Tertin [] is a professional gunsmith and is currently the director of research and development for a firearms manufacturer [and] is qualified to testify as a firearms expert." The excluded causation opinions of both experts are the subject of this appeal.

### a. Dr. William Vigilante, Ph.D.

Dr. Vigilante was retained as Plaintiffs' human factors and ergonomics expert. His opinions are based on rigorous research and analysis. In connection with his evaluation, in light of the fact that Sergeant Colwell's unintended discharge was not witnessed by anyone other than Sergeant Colwell, and was not captured on video, Dr. Vigilante's causation opinion was based upon, *inter alia*: (1) Plaintiff Michael Colwell's testimony; (2) depositions of Sig Sauer witness in this and other cases; (3) Sig Sauer's document production; (4) evidence, testimony, and records of other P320 unintended discharges; (5) multiple videos showing law enforcement officer's P320's discharging while holstered without the user touching the gun—proving that Sergent Colwell's version of events is plausible; (6) photographs and video of inspections of the subject Sig P320, exemplar P320s and competitor pistols including the Glock 19; (7) photographs of the holster used by Plaintiff; (8) his detailed knowledge of the functionality and utility of external safeties on firearms; (9) Sig Sauer's 2017 recall of the P320 to address inertial discharge vulnerabilities; and (10) his own inspections and testing; and (11) the testing of Plaintiff's gunsmith expert James Tertin. Based upon his expertise in the safe design of consumer products, his analysis of the record evidence, and his inspection and testing, Dr. Vigilante concluded that an external safety would have prevented Plaintiff's discharge. His opinions are based upon a robust evidentiary and scientific foundation, and the district court abused its discretion in excluding his

13

determination that the lack of a tabbed trigger safety was a substantial factor in causing Sergent Colwell's unintended discharge.

The purpose of Dr. Vigilante's "investigation was to determine if the Sig P320 has an elevated risk of unintentional discharge; if the elevated risk of unintentional discharge was foreseeable to Sig Sauer; [if] Sig Sauer should have included a manual external safety on its Sig P320; [and if] Sig Sauer's failure to include a manual external safety was the cause of the subject unintentional discharge." Expert Report of Vigilante, A109. Dr. Vigilante used the scientific method and foundational product design principles to reach the conclusion that the Sig Sauer P320 fails to incorporate reasonable safety measures to prevent unintended discharges; particularly in light of the fact that the P320 is uniquely susceptible to unintended trigger depression due to its exceptionally short and light trigger pull and first-in-class "lack of safety" design.

In his reports, Dr. Vigilante laid out the scientific principles and industry standards upon which he based his evaluation and analysis: ANSI Z690.2-2011. American National Standard: Risk Management Principles and Guidelines; ISO (1999 & 2007). 14121: Safety of machinery – Risk assessment – Part 1: Principles; National Safety Council (2001 & 2009). Accident Prevention Manual for Business and Industry (12th and 13th Editions); Seiden (1984). Product Safety Engineering for Managers; Handbook of Warnings (2006). Edited by Michael S. Wogalter; Woodson, Tillman, & Tillman (1992). Human Factors Design Handbook (2nd

Edition). Expert Report of Vigilante, A111. Dr. Vigilante reported that the "development and use of risk assessment principles has reached a stage where they are commonly accepted and practiced for the safe design and development of products." *Id.,* A110-111.

Dr. Vigilante's assessment began with a detailed description of the P320 and the incident scenario specific to the case. Then, Dr. Vigilante conducted a risk-assessment to determine whether the P320 has an elevated risk of unintended discharge, rooted in various reliable scientific principles and industry standards which are laid out in his report, along with an explanation as to why he selected such standards and principles, and how he used them. *Id.,* A110-111, 114-117.

Dr. Vigilante's analysis began with identifying the key potential hazard of a firearm: unintended discharges. Dr. Vigilante noted:

> The unintentional discharge of a firearm is a known risk associated with the use of handguns. However, the risk of unintentional discharge is a function of the design of the firearm and its intended use.
> \*    \*    \*
> Given the types of uses and users in conjunction with the design of the firearm, ***there was sufficient information for Sig Sauer to identify the increased risk of unintentional discharge*** associated with the use and misuse of its Sig P320 handgun.

*Id.,* A118-119 (emphasis added).

Relevant to the instant action, Dr. Vigilante noted that unintended activation of, or interaction with, the trigger by a foreign object can lead to unintended

15

discharges. *Id.* Dr. Vigilante relied upon Sig Sauer's published trigger travel distance measurements and the inspection measurement of Plaintiff's firearms expert, Jim Tertin, showing that the P320 trigger travel distance is .17 inches, and the Glock's is longer, measuring .223 inches, indicating it takes less movement to actuate a P320 trigger. *Id.,* A119.

Dr. Vigilante then concluded was more sensitive than competitor striker-fired guns because of the reduced movement required to fire the gun. *Id.* at A120.[3] Consistent with Mr. Tertin and Sig Sauer's own expert and witnesses, Dr. Vigilante too confirmed that the P320 is a single-action gun. This means that the striker—the mechanism that strikes the cartridge primer causing a bullet to fire—is cocked and under full spring tension when the gun is at rest. Because the P320 trigger does not cock the gun, or move the striker back against spring tension, it is shorter and lighter up to the break point. While this trigger feel may be desirable to shooters, it results in a trigger that requires less movement to actuate. Vigilante explained as follows:

> Given the design of the Sig P320 action, it acts similar to the cocking action of a 1911 hammer. As such, the Sig P320 trigger design is similar to a SA trigger where the trigger's function is simply to release the hammer. The combination of the SA type action in conjunction with the relatively short trigger pull helps the Sig P320 have a "short, crisp trigger pull" and "match trigger" compared to other striker fired guns. However, it also means the trigger is significantly more sensitive than competitor double action only (DOA) striker fire guns in that less movement of the trigger is needed to fire the gun. For example, Sig Sauer's expert Derek Watkins described the Sig P320 as "employing a short displacement trigger system" in his August 2, 2021 report in the Kyle Guay matter (SIG-EXPERT_00491). Watkins also noted that (SIG-EXPERT_00492):

---

[3] As part of his analysis, Dr. Vigilante also incorporated descriptions of the P320's trigger action system provided by Sig Sauer's own witnesses, *See* A229-30, Expert Report of Dr. Vigilante at p. 15-16

*Id.,* A120.

Given these risks, Dr. Vigilante noted that unlike its competitors who manufacture striker-fired pistols, Sig Sauer did not incorporate an external safety mechanism on the P320 – despite Sig Sauer's own website in 2014 noting that "...it offered a 'tabbed safety trigger for specific law enforcement clients.'" *Id.*

Based upon the lack of an external safety and short trigger pull, Dr. Vigilante concludes that it was reasonably foreseeable to Sig Sauer that the P320, as designed, was at an increased risk of an unintentional discharge compared to other striker fired handguns with tabbed triggers and longer trigger-pulls. *Id.*

Dr. Vigilante's analysis continued, with a consideration of the product's intended use and marketed user population: use in law enforcement, civilian defense, and competition. *Id.* A123. "In all three usages scenarios the Sig P320 is holstered and/or stored (e.g., in a purse) with a loaded chamber." *Id.* Significantly here, Dr. Vigilante noted that, "…Michael Colwell testified that his police department required them to carry their service pistol with a loaded chamber (i.e., "one in the chamber") (MC, 27)." *Id.* Given that "[a]ll three usage scenarios also result in dynamic movement and/or action[,]" in addition to the P320's "relatively short and crisp trigger pull and lack of a manual external safety," Dr. Vigilante concluded that the safety-less P320 is particularly susceptible to unintentional discharges. *Id*

Relevant to his causation opinion, Dr. Vigilante analyzed the risk of a foreign object contacting the P320 trigger, and the safety standards and/or guidelines aimed at reducing that risk. *Id.* Dr. Vigilante specifically and carefully considered the various guidelines, rules, and standards set by the National Rifle Association, the Independent Defense Pistol Associations, the International Confederation of Revolve Enthusiasts, and the United States Practical Shooting Association, which set out to, "help ensure the trigger is not accessed and the handgun is not discharged until the user is ready and purposefully actuates the trigger." *Id.* A123-125. These standards, coupled with the fact that Defendant was aware of incidents where the P320 discharged from, "impact, jarring, and/or striking while holstered or stored," Dr. Vigilante concluded that "[t]he risk of unintended discharge associated with an object inadvertently and/or unknowingly contacting the trigger was reasonably foreseeable to Sig Sauer." *Id.* Plaintiff alleges that his trigger must have been contacted by a foreign object while in its holster as his hand was not on the P320 when it discharged while fully holstered.

Ultimately, Dr. Vigilante concluded that "Given the lack of an external manual safety, such as a tab trigger safety, in conjunction with its trigger design and its intended use and user population, it was reasonably foreseeable to Sig Sauer that the Sig P320 was at an increased risk of an unintentional discharge." *Id.* Understanding this, Dr. Vigilante further concluded that Sig Sauer should have also ranked unintentional discharges high in a proper risk assessment due to "the severity of the

consequences, the high exposure rate, and the relatively high probability of occurrence…" *Id.*

Building on this conclusion, Dr. Vigilante continued his analysis with in-depth assessment of whether including a manual safety on the P320 would have been reasonable to mitigate the risk of unintended discharges. Dr. Vigilante relied on the "the widely recognized and utilized design safety hierarchy (1-7,9)", which places the responsibility on the product designer and manufacturer, once a hazard is identified, to address the hazard in one of the following ways:

1. Eliminate the hazard through design;
2. Provide safety feature to control or guard the hazard at its source;
3. Provide adequate warnings regarding the hazards associated with the use and reasonable foreseeable misuse of the product.
4. Provide training on the proper and safe operation of the product.

Dr. Vigilante's assessment began with an in-depth analysis of manual external safeties, beginning with identifying the different types of external safeties and how they function:

ISO 14121-2: 2007, *Safety of Machinery – Risk Assessment*, provides the following examples of safeguarding devices used to reduce the risk of an adverse event (e.g., fire) occurring (9):

When risk is reduced with the use of safeguards such as those listed under c), d) and e) below, there is little, if any, impact on the severity of harm. The greatest impact is on the occurrence of a hazardous event, with little impact on exposure:

> d) devices associated with safety-related functions of the control system of the machine (e.g. enabling device, limited movement control device, hold-to-run control device);
>
> An external manual safety on a handgun is a safeguarding device that is used to limit the movement of the trigger (i.e., the control). For example, the tab trigger safety on a Glock prevents the trigger from being pulled rearward. To pull a Glock trigger the tab trigger safety has to be deliberately depressed at the same time. As noted above, Glock's tab trigger safety is designed to prevent unintentional discharge if dropped or "subjected to any pressure that isn't a direct firing pull."[20] Similarly, a manual thumb safety prevents the trigger from being pull while engaged reducing the risk of unintentional discharge (ST, 37,38,97,98,169,170,201-203).

*Id.,* A128-129.

Significantly, Dr. Vigilante notes that "Safety devices (e.g., tab trigger safety, manual thumb safety) are safeguards that should be designed into a product as standard features (1-7,9). ***Safety devices are not optional and should not be left to the discretion of a customer to determine if the device is needed or worth the extra cost*** (1-7,9)." *Id.* at 25. Dr. Vigilante ultimately concluded that an external manual safety would have been a prudent and reasonable method to safeguard users from the risk of unintentional discharges. *Id.,* A133.

Dr. Vigilante then laid out his research, including his own data collection and analysis, on the functionality of manual safeties, concluding: "[t]he common use of handguns with trigger tab safety in conjunction with my own experience using such a trigger confirm the fact that a properly designed tab trigger safety integrated into the design of the Sig P320 would not affect the utility of the handgun." *Id.* In addition to applying real-world examples of how commonplace and effective manual safeties can be, Dr. Vigilante gathered and analyzed data from a study of how a manual thumb

safety might impact a user's ability to use their weapon. This study consisted of "17 shooters with various skill levels to present and fire one round using a Sig P320 with and without a manual thumb safety." *Id.*, A135. The study used a "P320 Nitron Compact slide, and an X-compact frame (similar to the subject P320) for the non-safety condition. A Sig P320-M17 frame with the same Nitron Compact slide was used for the manual thumb safety condition." *Id.*

An IDPA standard target with an 8" down zero circle mounted with a 5' shoulder height was used for all participants. Participants were positioned seven yards from the target. 15 of the participants started at the rotate position of the NRA's drawing from concealment technique. Using an electronic timer, at the beep signal participants joined, extended the pistol, acquired their sights on the target and fired. The other two participants started at low ready. For these participants, the beep signal required them to raise the gun, sight the target and fire. Each participant fired both pistols five times after having the opportunity to take five dry fire practices. The order of use between the Sig frame with (M17 frame) and without the manual thumb safety (X-compact frame) was varied between participants.

*Id.*

Dr. Vigilante's research confirmed what police departments across the United States and the military have known for over a century: manual thumb safeties do not impede a user's ability to draw and quickly fire a pistol.

Relevant to his causation opinion, Dr. Vigilante personally tested and compared firearms with tabbed trigger safeties and without tabbed trigger safeties. Dr. Vigilante recorded these tests, clearly demonstrating that a tabbed trigger will prevent a trigger from actuating with rearward pressure from the sides, the top and tip of the trigger. Vigilante confirmed that unless the tab, which is substantially smaller than the trigger itself, is depressed the gun will not fire. For a holstered gun

like Sergent Colwell's, a tabbed trigger would significantly reduce the area of the trigger a foreign object could contact the trigger to result in a discharge; including brushes/grazes, side pulls, bottom pulls and top pulls. *See,* Dr. Vigilante Testing Videos, A658. Vigilante's testing informed this opinion.



**Trigger Testing (without trigger safety), Dr. Vigilante Testing Video, A658**



*Trigger Testing (w/ trigger safety), Dr. Vigilante Testing Video, A658*

Dr. Vigilante conducted these tests using foreign objects, as well as his finger while attempting to actuate the trigger. Dr. Vigilante relied upon this testing in

reaching his causation opinion that, "had Sig Sauer integrated a tab trigger safety into the design of the Sig P320, the subject unintentional discharge would most likely not have occurred and Michael Colwell would not have been injured. *Id.,* A137; *see also* Vigilante Deposition in *Colwell*, A501, at 9:3-11.

In applying his findings to Sergeant Colwell's incident, Dr. Vigilante relied on Sergent Colwell's testimony and the Troy Police Department's incident report. Vigilante Deposition, A501, 10:5 – 11:1, A503, 18:7-15. Based on Colwell's testimony that his gun was holstered and his hand was not on the gun when it discharged, and Dr. Vigilante's review of other similar incidents, as well as his testing and analysis in this case, Dr. Vigilante concluded how the P320's defective design cased Sergeant Colwell's unintended discharge:

> ·Q: Do you know what portion of the trigger was contacted, assuming it wasn't an inertial trigger pull, causing it to move?
> A: I know that there was not a full placement of the finger on the front face of the trigger to pull back.
> Q: What was that based on?
> A: Mr. Colwell's testimony.
> Q: Any physical evidence to support ·that or are you just relying on his testimony on how the incident occurred?
> A: I'm relying upon his testimony how the incident occurred, as well as its consistency with other cases I've investigated and the cases I've found information on.

*Id.* A504, at 21:1-10.  Dr. Vigilante explained his reasoning for his causation opinion that a tabbed trigger is effective at preventing unintended discharges for holstered firearms and would have likely prevented Sergent Colwell's unintended discharge at

23

his deposition. He explained that, a foreign object "not only has to get in [a holster] and put pressure on the trigger, is has to get in there and *get in front of the trigger* an and then press back on the trigger [to depress the tab]. You have two actions as opposed to one that allowed with the P320." A508, 37:18-23. Dr. Vigilante concluded that the absence of a tabbed trigger was a substantial factor in causing Sergent Colwell's holstered P320 to discharge.

### b. James Tertin

Mr. Tertin was retained to perform an inspection of the subject P320 and conduct an analysis of the design of the P320 to "analyze the adequacy and sufficiency of the safety mechanisms on Michael Colwell's Sig Sauer P320 pistol." *See* Expert Report of James Tertin, A190. Mr. Tertin physically examined and tested the subject P320, an exemplar P320, other competitor pistols, and reviewed discovery materials, depositions, expert reports, videos, and product literature for the P320 and competitor manufacturers. *Id.* A189-190

Mr. Tertin's analysis began with a physical examination of the subject P320:

> On October 10, 2022, I inspected a Sig Sauer P320 pistol with serial number 58J109611. It was represented to me that this was the pistol that fired on Mr. Colwell.
>
> I measured the trigger travel distance using a dial caliper. I measured the trigger weight using a certified spring trigger pull gauge certified at four pounds. I measured the sear engagement using a bladed depth micrometer.
>
> The distance from the resting point to the set point was .101". The trigger pull weight from the resting point to the set point was 1.5 pounds. The distance from the set point to the break point was .049". The trigger pull weight from the set point to the break point was 5 pounds. The striker-sear engagement was .045." I took these measurements in the same method as provided in Appendix A of my reports in the Lang and Slatowski matters.
>
> The subject pistol was not equipped with any external safeties. There was no manual thumb safety, no grip safety, and no trigger safety.

Mr. Tertin began his in-depth analysis by first explaining the difference between a single-action and double-action firearm and concluded that the P320 is a single-action pistol – an important assessment and distinction given Sig Sauer's misleading representations that the P320 is neither double-action nor single-action. *Id.*, A190-191.

In support of this conclusion that the P320 is a single-action firearm, Mr. Tertin filmed a test of exemplar P320, where he "cut out a piece of the slide of a P320, making the striker visible during the normal operation of the gun." *Id.,* A192. Mr. Tertin filmed the P320's striker before, during, and after pulling the trigger several times. *See* Tertin Videos, A407



*Exposed striker on a P320 (M17 model with manual safety included)*

*See* A192; *see also* James Tertin Testing Videos, A407. These videos confirm that, "the striker is fully charged by the forward motion of the slide or by fully articulating the slide, and that the trigger pull serves only to release the striker." *Id.* at 193.[4]

Mr. Tertin's comparative analysis continued with the Colt 1911 pistol, which Defendant's expert Derek Watkins compares to the P320, to support his opinion that single-action guns must be equipped with external safeties to make them reasonably safe. *Id.*, A195-196. As Mr. Tertin explains:

> All engineers must follow the design hierarchy when considering the safe design of a product. A manufacturer should first try to eliminate the hazard through design. Then, if it can't, it must implement the necessary safeguards to minimize the risk of such hazards or, as a last resort, provide warnings to the end-user.

*Id.* at A195.

---

[4] Defendant's own expert, Derek Watkins, confirmed Mr. Tertin's conclusions and admitted that the P320 is a single action firearm. *See* Deposition of Derek Watkins, 114:24-115:2; 144:16-1; Derek Watkins Expert Report at p. 6 ("The P320 also employs a passive safety system, meaning the safety is engaged at all times when the pistol is cocked, and the trigger is not being pulled."

Understanding that "the trigger travel distance of a single-action gun makes it very easy for the trigger to be inadvertently actuated by a part of a user's body or a foreign object[,]" Mr. Tertin explained that it is "even more imperative that single-action guns have a manual external safety that prevents the trigger from being moved without intent." *Id.* Due to the complete absence of an external safety on the P320, the P320's trigger is susceptible to inadvertent discharge from unintended contact with the trigger by a foreign object. Mr. Tertin's analysis revealed that the P320's internal safeties "are disengaged with exceptionally little manual effort, and are disengaged during the pre-travel and before the trigger is actuated. Unfortunately, once the internal safeties are disengaged, the pistol becomes susceptible to discharging without user's intent and without complete trigger actuation." *Id.* Ultimately, these internal safeties are not enough – as Mr. Tertin explains they also are not "visible to the user; who cannot be reasonably expected to understand how they function and if they are functioning as intended." *Id.*

Mr. Tertin then continued his analysis by comparing the different types of external safeties that Sig Sauer could have used on the P320. *Id.*, A200. These include thumb safeties, grip safeties, and tabbed trigger safeties. Significant for this case, Mr. Tertin details the tabbed trigger safety, which Sig Sauer originally offered on the P320, but never manufactured.

A trigger safety, the most widely used type of safety for striker fired guns, is a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon. Trigger safeties are able to effectively and efficiently prevent accidental discharges because they require a user's finger to be placed squarely on the center of the trigger prior to the pistol being discharged. Therefore, the user is required to more deliberately place their finger on the trigger to fire the weapon. Trigger safeties are found on all Glock striker-fired pistols, the Springfield Hellcat series, the Springfield XD series,

the Walther PDP series, the Walther PPQ series, the Walther Q5 series, the Taurus GX4 series, the CZ P-10 series, the M&P 2.0 series, the Ruger Max-9 (also equipped with a thumb safety), and the H&K VP9 series among others. It is important to note that a tabbed trigger safety was permitted under the ICE contract with Sig Sauer.



***Glock tabbed trigger safety***

*Id.*, A202-203.

In relying on his expertise in the effectiveness of tabbed triggers at preventing unintended discharges, his own testing of the Glock tabbed trigger compared to the P320's trigger, an analysis of the hazards posed by single-action triggers on guns without safeties, the many reports of unintended discharges, and videos of other similar incidents, Mr. Tertin ultimately concluded that the P320 is uniquely and unreasonably susceptible to unintended discharges. *Id.*, A203. As he explained:

28

> The fact that nearly every Sig Sauer P320 sold to law enforcement and the general public is sold without any type of manual safety makes the P320 unique among single-action pistols; and uniquely dangerous.
>
> The distinctively dangerous characteristics of the Sig Sauer P320, along with the internal design decisions discussed below, explain the sheer number of incidents of unintentional discharges across the country; especially among highly trained and skilled firearms users. I have been made aware of close to 100 other incidents of the P320 discharging when a user believes they did not pull the trigger. On several of these occasions, Sig Sauer claimed the trigger was pulled by a foreign object like a seatbelt. I have also reviewed several videos of P320 unintended discharges where the user does not pull the trigger.

*Id.*

Mr. Tertin then continued his analysis that in selling P320's to law enforcement, and advertising its pistol capacity at 15+1, indicating a round can be carried in the chamber, "Sig Sauer was clearly aware that the practice of carrying the P320 with a round in the chamber was dangerous, but manufactured the single-action pistol without manual safeties anyway." *Id,* A204. Indeed, like most law enforcement officer, Michael Colwell was *required* to carry his duty-issued P320 with a round in the chamber despite there being no safeties on the gun. *See* Michael Colwell Deposition, A029, 27:17-20.

Lastly, Mr. Tertin performed a comparative analysis of the P320 and its closest rival, the Glock:

First, unlike the P320, all Glock pistols are functionally double-action pistols. The trigger pull on a Glock serves to both cock and release the striker. *See* Appendix F. This results in a much longer trigger pull, which in turn makes the pistol far more difficult to accidentally discharge. On March 24, 2022, I measured the trigger travel distance of an exemplar Glock 19. The trigger travel distance to discharge the pistol was .223 inches under full weight for the length of the pull; roughly four times longer than the P320 trigger pull under full weight.

Second, all Glock pistols are equipped with a trigger safety. As provided above, the trigger safety is a highly effective tool to prevent unintended discharges.

*Id.*, A205.

Mr. Tertin's analysis led to the conclusion that Glocks are safe in their design and far less susceptible to unintended discharges due to their double-action design (meaning the striker is not pre-cocked), their significantly longer trigger pull, and the presence of a tabbed trigger safety. *Id.* Mr. Tertin's conclusions are supported by testing demonstrating a variety of incidental trigger contact scenarios ***where a tabbed trigger would prevent a discharge, but the P320's trigger would be fully depressed***. *See* James Tertin Testing Videos, A407. As seen below, when these various contact scenarios are tested on a Glock with a tabbed trigger, the tabbed trigger safety locks the trigger from depressing and prevents an unintended discharge from rearward pressure from the sides of the trigger.



***Trigger Testing – Side Pull on Glock with Tabbed Trigger***
***James Tertin Testing Videos, A407***



***Trigger Testing – Top Pressure on Glock with Tabbed Trigger***
***James Tertin Testing Videos, A407***

When similar testing was done on the P320, a single-action pistol without a tabbed trigger, however, the trigger fully depresses and the pistol fires.



***Trigger Testing – Side Pull on P320 without Tabbed Trigger***
***James Tertin Testing Videos, A407***

These demonstrative videos confirm the effectiveness of a tabbed trigger in preventing the pistol from unintentionally discharging from rearward pressure to the sides of the trigger—the location exposed when the gun is holstered. A tabbed trigger, which is a narrow tab in the middle of the trigger, locks the trigger from discharging and the trigger is only unlocked if the tabbed is depressed. *See* Tertin Deposition in *Colwell*, A423 19:1-4 (disengaging the tab requires "locating the tab, moving it back, [and] unlocking the trigger."). On a P320 trigger with no trigger safety, the trigger is always unlocked and sufficient rearward pressure to any point on the entire surface area of the P320 trigger will result in a discharge. *See* James Tertin Testing Videos, A407.

Based on this in-depth analysis and testing, Mr. Tertin ultimately concluded that: (1) The P320 was unreasonably dangerous and defectively designed because the combination of its extremely short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated, and (2) The defective design of the P320 was a proximate cause of Plaintiff's accident, in the event that his finger or a foreign object touched the trigger. *See* Expert Report of James Tertin, A206-A207, at 18-19. At his deposition, Tertin testified that Sergent Colwell's unintended discharge would not have occurred if there had been a tabbed trigger on the Sig Sauer P320. A421, 15:1-3.

### B. Procedural Background

Plaintiffs filed their Complaint on November 2, 2021, in the United States District Court for the Northern District of New York. *See* Colwell Complaint, A070, at 1. Plaintiffs' complaint alleges claims of product liability, negligence, and breach of warranty against Sig Sauer for designing and distributing the P320 without an external safety which caused Michael Colwell's injury. *Id.,* A072-A102. Following discovery which closed on March 17, 2023, Defendant filed *Daubert* motions seeking to exclude the causation opinions of Plaintiffs' experts only, along with a motion for summary judgment. *See* Sig Sauer's Motion for Summary Judgment and Motion to Exclude William Vigilante and James Tertin in *Colwell,* A208-A286.

On April 7, 2023, Plaintiffs filed their Response to Defendant's Motion for Summary Judgment and their Responses to Defendant's Motions to Exclude Plaintiffs' Experts' Causation Opinions. *See* Plaintiffs Responses in Opposition to Sig Sauer's MSJ and MTE William Vigilante and James Tertin in *Colwell,* A287-385. That same day, Plaintiffs also filed a Response to Defendant's Statement of Undisputed Material Facts, as well as their own Statement of Undisputed Material Facts in Support of their Response to Defendant's Motion. *See* Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts, A287; Plaintiffs' Statement of Undisputed Material Facts, A323. The trial court elected to decide the matter without oral arguments.

On September 17, 2024, the Honorable Judge Sannes issued an order granting all of Defendant's motions, and dismissed Plaintiffs' Negligence and Strict Product Liability claims. *See*, Order Granting Sig Sauer's Motion for Summary Judgment in *Colwell,* A386. Plaintiffs filed their Notice of Appeal on October 15, 2024, within the thirty days permitted under Fed. R. App. P.(a)(1)(A). *See* A1. Judgment was entered on behalf of Sig Sauer on October 18, 2024, dismissing *all* of Plaintiffs' claims. *See* District Corut Opinion, A405. Plaintiffs then filed a second notice of appeal on November 18, 2024, also in accordance with Fed. R. App. P.(a)(1)(A).

### 1. District Court Ruling Presented for Review

As an initial matter, the district court failed to review Plaintiffs' filings in their entirety. The opinion presently on appeal erroneously stated in a footnote: "Plaintiffs failed to respond to Defendant's statement of undisputed material facts, as required by NDNY Local Rule 56.1(b), and Plaintiffs' briefing does not address the discrepancies between the reports of the incident and Michael Colwell's testimony." *See* Order Granting Sig Sauer's Motion for Summary Judgment in *Colwell,* A388, at n. 1. This is incorrect. The record clearly reflects that Plaintiffs' timely and completely briefed this matter. Plaintiffs' response to Defendant's statement of undisputed material facts, with Exhibits A-T, *and* Plaintiffs' own statement of undisputed material facts were filed along with Plaintiffs' other briefing on this matter on April 7, 2023, within the filing deadline. *See* Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts, A287; Plaintiffs' Statement of

34

Undisputed Material Facts, A323. Further, Plaintiffs' response to Defendant's statement of undisputed material facts includes factual responses and arguments regarding the incident reports and Colwell's testimony. The court's failure to consider these filings and view the record in its entirety is prejudicial to Plaintiffs and contradicts the governing law and provides an independent basis to reverse. Further, there were no other witnesses to Sergent Colwell's incident, and it was not captured on video. As such, any alleged discrepancies must be resolved in his favor, as the non-movant, and as the law requires. Further, the OSI videos corroborate that the P320 can and will discharge in its holster without the user touching the gun, by inadvertent contact with the trigger.

The district court accepted Mr. Tertin's unchallenged design defect opinions and findings. The court explained that "The P320 functions as a single-action pistol, with a striker that is 'fully cocked and ready to be fired before any trigger movement.'" *See* A391. The court continued that "[T]he trigger travel distance of a single-action gun makes it very easy for the trigger to be inadvertently actuated by a part of a user's body or a foreign object." *Id.*

The court then discussed the lack of external safeties on the P320. *Id.,* A391-A392, (*"*Although the P320 has internal safeties, it has no external safeties. External safeties 'help prevent unintended discharges by manually blocking the trigger from being pulled until the user decides they are ready to fire.' Competitors sell striker-

fired handguns with external safeties, such as (1) thumb safeties and (2) tabbed trigger safeties." *Id.* (internal citations omitted).

The district court then began its individual review of each expert's causation opinions, understanding that: "Mr. Tertin opined that the P320 is 'unreasonably dangerous and defectively designed because the combination of its extremely short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated.' Mr. Vigilante offers similar opinions." *Id.*, A392 (internal citations omitted).

The court's analysis of Dr. Vigilante's causation opinion selectively discussed his analysis and factual foundation and takes issue with the lack of accident-specific testing. After briefly discussing Dr. Vigilante's supposed "limited" knowledge of the incident, the trial court states that his causation opinion "did not pass muster under Fed. R. Ev. 702." *Id.,* A393. The court disregarded the objective data and incident videos that formed that basis of Dr. Vigilante's causation opinion, which the district court deemed to be not "based on sufficient facts or data…"*Id.,* A393. The court attempted to distinguish Dr. Vigilante's opinions in this case from his admissible causation opinions in other federal cases, *Catatao v. Sig Sauer* and *Lang v. Sig Sauer*, in which those federal district courts found Dr. Vigilante's causation opinion admissible. *Id.,* A395-A396.

With respect to Mr. Tertin, the court acknowledged Mr. Tertin's "inspection of an exemplar P320, his review of several competitor pistols, and videos of other

similar incidents" relied upon in forming his opinion, though dismisses the video testing Mr. Tertin performed, showing a variety of incidental trigger contact scenarios where a tabbed trigger would prevent a discharge. *See Id.,* A396. Mr. Tertin both appended a video to his expert report and submitted further videos as demonstrative exhibits for the court. *See* Tertin Testing Videos, A407. Instead, the court took issue with the lack of accident-specific testing.

The court pointed to supposed factual gaps in Mr. Tertin's report, holding that his "analysis hinges on 'practical function' that because a pistol with a tabbed trigger has "one more step for safety," Plaintiff's pistol would have been less likely to fire if it had a tabbed trigger." *Id.,* A397.

The court next addressed Defendant's motion for summary judgment. *Id.* The court found that expert testimony on causation is required for the jury to decide the issue of causation. *Id,* A401. ("…there is no clear description of what caused the P320 to discharge and how the accident happened. ***And the mechanics of a P320 firearm are not within the common knowledge of a lay person***...") (emphasis added). What the district court failed to consider was that the mechanics of the P320 can and will be thoroughly explained to the jury through Dr. Vigilante and Mr. Tertin's admissible and unchallenged design defect opinions.

The district court concluded that "[n]o jury could rationally conclude from the evidence adduced by Plaintiffs that the gun's alleged defects caused the injuries in this case." *Id.* Plaintiff submits that the district court's view of his case has been

proven wrong by two jury's, as the only two cases Plaintiff's counsel has taken to verdict have both found that the P320 was defectively designed due to a lack of a tabbed trigger and the defective design was the factual cause of the unintended discharge. *See Robert Lang v. Sig Sauer, Inc.*, No. 1:21-CV-04196-ELR,2023 WL 4074160 (N.D.Ga.)[5]*; George Abrahams v. Sig Sauer, Inc.,* No. Civ. Case No. 220601213 (Phila. Com. Pl., Nov. 2024)

## IV.   SUMMARY OF THE ARGUMENT

The trial court committed sever errors that require this case be remanded to the district court for trial.  First, the district court's opinion makes clear that it did not consider Plaintiff's response to Defendant's statement of undisputed material facts, and did not consider Plaintiff's own statement of undisputed facts.  While a district court need not parse or address every argument made, its summary judgment decision must be based upon a review of the complete record.  The district courts opinion states that "Plaintiffs failed to respond to Defendant's statement of undisputed material facts", indicating it did not review Plaintiff's response to Defendant's statement of facts or consider Plaintiff's own statement of undisputed facts.  The district court also failed to give any weight to the objective data from ICE,

---

[5] The trial court in *Land* affirmed the jury's verdict on February 6, 2025, denying Sig Sauer's motion for a new trial.

or the OSI Videos which provided further support for Plaintiff's experts' causation opinions.

Second, the district court abused its discretion in excluding Plaintiff's experts' causation opinions. The cause of Plaintiff's unintended discharge is not complicated, and does not require incident specific testing. The complex part of this case is Plaintiff's experts' design-defect opinions which are based upon extensive research, knowledges, testing, inspection, and measurements of the P320, and its competitor pistols. What Plaintiff's experts investigation and analysis has confirmed, is that the Sig Sauer P320 unreasonably susceptible to unintended discharge by foreign objects contacting the trigger and causing the gun to fire. Other pistols like the Glock, with longer and more robust double-action triggers, require a longer pull to actuate the trigger. Plaintiff's experts testing confirmed that the P320 is a single-action gun with a short trigger pull that requires less movement to actuate. Additionally, while all the P320's competitors in the striker-fired pistol market have external safeties, like a manual thumb safety or a tabbed trigger safety, the P320 has none. The renders the P320's trigger uniquely susceptible to unintended discharge.

Plaintiff's design defect opinions have identified the features that make the P320 uniquely prone to unintended discharge while the gun is holstered. Sig Sauer claims that the P320 cannot discharge without a trigger pull, meaning, any time the gun is holstered and the user is not touching the gun, it will only discharge if a foreign

object applies a force to the trigger.  Plaintiff's experts obtained data from the ICE agency that support their opinion that the P320, with its single-action design and no external safeties, is unreasonably prone to unintended discharge.  Plaintiff's experts have also reviewed video evidence of unintended discharges strikingly similar to Plaintiff's incident, all of which Sig Sauer can only explain by a foreign object contacting the trigger.

It is not that foreign objects contact P320 triggers more than any other gun, but the P320 discharges with regularity when contacted by a foreign object due to its single-action design and lack of a trigger safety.  Plaintiff's experts performed demonstrative testing proving the efficacy of a tabbed trigger in defeating rearward pressure on the trigger when the tab is not depressed.  The P320's trigger has not safeguards for unintended trigger contact.  Based upon their testing, analysis, and review of the record, Plaintiff's experts reached reliable and common-sense causation opinions that are admissible and supported by objective facts and data.

Third, even without Plaintiff's expert's causation opinions, summary judgment must be denied.  Sig Saure did not challenge Plaintiff's experts' qualifications or their design defect opinions which are admissible at trial.  The district court granted summary judgment after excluding causation opinions only, reasoning that "the mechanics of a P320 firearm are not within the common knowledge of a lay person..."  However, as the Sixth Circuit recently ruled, the jury

will learn about the mechanics of the P320 at trial during Plaintiff's experts design-defect testimony and explanation and will therefore be educated as to the part of the case that is outside their common knowledge. Ultimately, this case boils down to whether a tabbed trigger would have, more likely than not, prevented Sergent Colwell's unintended discharge. Once the jury is educated as to the mechanics of the P320, the difference between a single and double-action gun, and the function and utility of a tabbed trigger safety, the jury, and only the jury, can determine the factual issue of causation. For these reasons, this Court must reverse.

## V. ARGUMENT
### A. Standards of Review
#### 1. Exclusion of Expert Testimony

This court reviews the district court's decision to exclude Plaintiffs' experts for an abuse of discretion. *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Importantly, this review applies the abuse of discretion standard "as much to the trial court's decisions about *how to determine reliability* as to its ultimate conclusion." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). An abuse of discretion is found when the district court's decision to exclude expert testimony is "manifestly erroneous."" *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995).

Once qualified as an expert witness, the court's role resembles that of a "gatekeeper," ensuring that any scientific testimony admitted is relevant and reliable. *Daubert*, 509 U.S. at 589. It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. Even if the proffered expert conclusions are "shaky", the proper course is not exclusion, but rather any weakness must be exposed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

### 2. Summary Judgment

This court reviews *de novo* the district court's grant of summary judgment in favor of Sig Sauer. *Burns v. Martuscello*, 890 F.3d 77, 83 (2d Cir. 2018). Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be entered only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The record must be read in the light most favorable to the non-moving party, which is the plaintiff in this case. *Matsushita Electric Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Anderson*, supra. However, the plaintiff must produce competent evidence on each of the elements of the case when the facts, which when viewed in the light most

42

favorable to the non-moving party, are sufficient to create a jury question on each of the elements. *Id.* A genuine issue of material fact exists where evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Id.*

### B. The District Court's Improper Ruling is Based on an Incomplete and Inaccurate Review of the Record

The district court's ruling, it appears, is based on an incomplete review, or misreading of the record. The court, twice, failed to fully and completely review Plaintiffs' briefing on key issues before it made its summary judgment and *Daubert* rulings.

First, on page three of the district court's decision, in a footnote, the court states that "Plaintiffs failed to respond to Defendant's statement of undisputed material facts, as required by NDNY Local Rule 56.1(b),". *See* A388, at n. 1. Plaintiffs, however, filed a timely response on April 7, 2023, seen at Doc. No. 51 of the record, with Exhibits A-T. *See* Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts, A287; Plaintiffs' Statement of Undisputed Material Facts, A323.

In the same footnote, the Court further states that Plaintiffs' briefing, "does not address the discrepancies between the reports of the incident and Michael Colwell's testimony." See A388, at n. 1. Plaintiffs' response to Defendant's statement of undisputed material facts, that the district court failed to review or consider, includes factual responses and arguments regarding such reports. As Plaintiffs argued

43

therein, "The EMS was not present at the moment of the unintended discharge and Defendant's conclusory statement is *made without any attribution of any factual findings by any witness to the event*. Defendant's averment is a material issue of disputed fact." *See* A288 at ¶8.

Second, the district court failed to consider the qualifications of Plaintiffs' experts. Although their respective qualifications to render design defect opinions were not challenged, they were still relevant for informing and supporting their causation opinions. This is notable because "[t]he court must also consider the fact that 'experience in conjunction with other knowledge, skill, training or education ... [may] provide a sufficient foundation for expert testimony,' and '[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.'" *Argonaut Ins. Co. v. Samsung Heavy Indus. Co.*, 929 F. Supp. 2d 159, 164 (N.D.N.Y. 2013) (quoting Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702)(emphasis added); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 141 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience") (emphasis added).

Putting aside Dr. Vigilante's reliable methodology, the lower court's lack of consideration for his extensive experience and expertise, and accusations that Plaintiffs did not completely and/or sufficiently brief this matter demonstrates that the district court failed to consider key arguments and information in Plaintiffs'

briefing. Without a complete and accurate review of the record, including Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts *and* all relevant briefing and documentation on Plaintiffs' experts, the district court's decision to exclude Plaintiffs' experts and award summary judgement is plainly improper and an abuse of discretion; such discretion does not extend to a selective or incomplete review of the record.

Third, the district court granted summary judgment based upon there being "no clear description of what caused the P320 to discharge and how the accident happened. And the mechanics of a P320 firearm are not within the common knowledge of a lay person...". *See,* A401. But what is common in nearly every unintended discharge is that the user cannot explain how or why the P320 discharged in its holster without the user touching the gun. What Sig Sauer has consistently maintained throughout this nationwide litigation, is that the gun will not fire on its own — a point the Plaintiff does not contest. As such, the *only* explanation is unintended contact with the trigger while the gun is holstered—which the tabbed trigger is designed to prevent. The district court's grant of summary judgment *because* the mechanics of a P320 firearm are not known by laypersons is misguided, because the design defect opinions of Plaintiffs' experts would educate the jurors about the mechanics of the P320, its single-action design, it's extremely short trigger, and its trigger that lacks any tabbed trigger or external safety.

The district court's opinion indicates it did not conduct a complete review of the record, or Plaintiffs' briefing, failed to give appropriate weight to Plaintiffs' experts qualifications and experience when assessing their causation opinions. Specifically, the district court did not the OSI videos, the ICE data, and Sig Sauer's testimony that the P320 is responsible for more unintended discharges than any other pistol they sell, all of which is objective evidence that the P320 is uniquely susceptible to unintended discharge while holstered due to its unique design—single-action, very short trigger travel, and no trigger safety. Had the district court reviewed the fulsome record, it would have appropriately denied Defendant's *Daubert* motions and motion for summary judgment.

### C. The District Court Abused its Discretion in Excluding Plaintiffs' Expert Witness Testimony.

The testimony of Plaintiffs' expert witnesses, as it related to the cause of the unintended discharge by the Sig P320, was sufficiently reliable to be admissible, and thus, the trial court erred in excluding this testimony. A compete review of the record demonstrates that Plaintiffs' experts used reliable methodologies, grounded in sound reasoning and ample record support for their conclusions, and that the trial court erred in making its own competing determinations as to credibility of witnesses and singular focus on so-call incident specific testing. There was a substantial factual basis supporting Plaintiffs' expert's causation opinions. Thus, the experts' conclusions that the design defects of the P320 were a factual cause and/or

a substantial factor in causing Sergent Colwell's unintended discharge satisfy *Daubert* and are admissible.

### 1. The Record Supports Tertin and Vigilante's Conclusions that an External Safety Would Likely Have Prevented Sergeant Colwell's Unintended Discharge

The district court incorrectly found that the causation opinions of Mr. Tertin and Dr. Vigilante lacked a sufficient factual basis and reliable methodology. The district court's decision is predicated alone on the fact that Plaintiffs' experts, in coming to their causation opinions, did not perform incident-specific testing or investigations regarding Sergeant Colwell's unintended discharge. First, Plaintiffs' experts did inspect the gun, review statements and testimony from Sergent Colwell, the only witness to the event, and viewed the subject gun in the holster—showing gaps in the trigger-guard when holstered. Plaintiffs' experts also performed testing that proved the P320 functions as a single-action gun, took trigger travel distance measurements of the P320 and competitor pistols, and performed demonstrative testing on the P320 and the Glock, demonstrating the use and benefit of a tabbed trigger safety. So-called incident specific testing was not required for Plaintiffs' experts to opine that a tabbed trigger safety would have prevented Sergeant Colwell's unintended discharge.

In New York, a plaintiff bringing a design defect claim must prove, *inter alia*, the existence of a feasible safer alternative design. *See Beruashvili v. Hobart Corp.*, No. 05CV1646ENVMDG, 2010 WL 11622750, at *6 (E.D.N.Y. July 15, 2010)

47

"While testing is not an 'absolute prerequisite' for an expert's theory of causation or alternative design to be admissible in a design defect case, it is usually critical to show that an expert 'adhere[d] to the same standards of intellectual rigor that are demanded in their professional work… Adherence to engineering standards of intellectual rigor almost always requires testing a hypothesis *if the expert cannot point to an existing design in the marketplace*.'" *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 76 (S.D.N.Y. 2001)(citations omitted). As discussed, both experts have identified and analyzed multiple design alternatives for the inclusion of an external safety using safety devices that already exist, and are widely used and accepted, in the firearms industry – tabbed trigger safeties and manual thumb safeties. Not only is a tabbed trigger safety used on every other competitor striker-fired pistol as explained in Dr. Vigilante's report, but Sig Sauer *originally designed the P320 with an operation for a tabbed trigger. See* Dr. Vigilante Expert Report, A121. Here, Plaintiffs' design defect o

Further, in *Nemes v. Dick's Sporting Goods, Inc.*, for example, plaintiff brought design defect claims against the defendant claiming that the lack of proper finger guards on her Lady Raptor crossbow, "which could have created a barrier between the foregrip and the flight track, and blocked [plaintiff]'s thumb from going into the bow string path," caused her injury. No. 17-CV-1688 (NSR), 2019 WL 3982212 at *2 (S.D.N.Y. Aug. 23, 2019). There, the court found plaintiff's expert's opinion, as to whether the Lady Raptor posed a substantial likelihood of harm, admissible where

48

he: personally inspected the crossbow, relied upon testimony from the company's engineers admitting the risk in how the crossbow is designed, and applied prevailing industry standards. *Id.* at \*5-6. Despite a lack of accident reconstruction testimony, for example, the court still accepted the expert's causation opinion, reasoning:

> [having] already found that his sources of information were vast and reliable enough for him to opine on whether the Lady Raptor posed a substantial likelihood of harm. Further, ***his physical testing of the Lady Raptor, as it is currently designed, and comparison with other models, as they are currently designed, are reliable testing methods for proving causation for a relatively simple device***. In conjunction with the amputation videos, patent applications, and reports of consumer injuries, as well as Daniel Davis's and David Barnett's concessions regarding the likely risk of harm, O'Donel's testing methods are sufficient for him to opine that the Lady Raptor's design was a foreseeable cause of Mrs. Nemes's finger injury.

*Id.* at \*10.[6]

Here, Plaintiffs' experts arrived similarly at their reliable causation opinions. In reaching their conclusion, however, the district court dismissed all testing and research done by Plaintiffs' experts and chose to selectively identify and focus only on methods not employed in determining their opinions were unreliable. A full and complete review of the record demonstrates that Plaintiffs' causation experts'

---

[6] It is important to note here the expert in *Nemes* was not permitted to opine as to a feasible alternative design because he could not demonstrate that there was already a feasible alternative device on the market, nor did he "[engage] in any actual testing or found a plausible solution to the issue with the Lady Raptor or similar devices." *Nemes,* at \*8. The same is not true here, as the tabbed trigger was originally designed for the P320, but never manufactured.

49

opinions are based on a sufficient factual and scientific foundation, utilizing reliable methodology in coming to their respective causation opinions.

Dr. Vigilante, in coming to his opinions, and as detailed throughout, conducted an extensive risk-analysis, performed his own research and testing, applied prevailing industry standards, and assessed the feasibility of including an external safety on the P320. Dr. Vigilante relied upon objective data demonstrating the stark increase in unintended discharges with the P320, that can only be explained by the features that make the P320 unique among its competitors, namely the single-action, short trigger, with no tabbed trigger safety. Vigilante stated in his report:

> [g]iven the increased risk of unintentional discharge associated with the design of the Sig P320 trigger, its intended use and user population, along with its own knowledge of the frequency of unintended discharges that were not comparatively known to users and customers, Sig Sauer should have integrated an external manual safety (e.g., a tab trigger safety and/or manual thumb safety) into the design of the handgun.
>
> Had Sig Sauer integrated an external manual safety into the design of the Sig P320 it would have significantly reduced the risk of an unintentional discharge without adversely affecting the utility of the handgun.

*See* Expert Report of Dr. Vigilante, p. 28.

Dr. Vigilante then applied his findings to the facts as testified by Sergent Colwell. Dr. Vigilante concluded that:

> The subject unintentional discharge occurred while the subject Sig P320 was holstered and Michael Colwell's finger and hand were off of the handgun and trigger….

50

> Had Sig Sauer integrated a tab trigger safety into the design of the Sig P320, the subject unintentional discharge would most likely not have occurred and Michael Colwell would not have been injured.

*See,* Expert Report of Dr. Vigilante, A135-A136.

Similarly, Mr. Tertin's causation opinions are grounded in his reliable research, testing and analysis. Mr. Tertin's testing was able to confirm that the P320 functions as a single-action gun. His measurements confirmed that the P320 trigger travel distance is far shorter than competitors. And his testing of the tabbed trigger specifically demonstrates its effectiveness in preventing trigger actuation from contact to the sides of the trigger. These videos demonstrate a variety of incidental trigger contact scenarios ***where a tabbed trigger would prevent a discharge, but the P320's trigger would be fully depressed***. *See* Tertin Testing Videos, A407. His analysis and testing of the tabbed trigger informed his causation opinion.

In his deposition, Mr. Tertin explained the "practical function" of the tabbed trigger which would have likely prevented this unintended discharge:

> "It's several distinct movements to unlock and free up the trigger to allow it to fire.…Locating the tab, moving it back, unlocking the trigger. · Then there's slack involved. We call that free travel."

*See* James Tertin Deposition in *Colwell*, A423, at 18:22-19:4. Because Sergent Colwell's gun was holstered, it is highly unlikely that foreign object could have entered the trigger guard, turned 90 degrees flush across the face of the trigger, and pulled the trigger rearward. However, on a P320 trigger, a side pull or graze could

have actuated the trigger due to it not having a tabbed trigger safety. This common sense principle was confirmed by Mr. Tertin's testing and forms the basis of his causation opinion.

Mr. Tertin's opinions are thus not speculative, as a review of the record establishes that Mr. Tertin: 1) disassembled and tested exemplar P320s; 2) reviewed extensive literature of the P320's competitor guns, 3) personally conducted videotaped testing of the conditions which could cause a P320 to discharge and compared it to the conditions which could cause a tabbed trigger-equipped Glock to discharge, revealing multitude of unintentional contact scenarios where the tabbed trigger effectively prevents trigger depression; 4) viewed videos of P320's discharging without the user touching the trigger, 5) reviewed affidavits and deposition testimony from individuals involved in other similar incidents; and 6) reviewed data from ICE establishing the real-world effectiveness of the tabbed trigger safety.

Mr. Tertin ultimately concluded that, "If Sig Sauer had not made the only single-action pistol on the market without any manual safeties, Plaintiff's accident most likely would not have occurred, in the event it was caused by his finger or a foreign object touching the trigger." *See* Expert Report of Tertin, A207.

Plaintiffs' experts' respective methodologies, like the experts in *Nemes*, are therefore sufficient to opine as to causation. Instead, any challenge to the inadequacies of a study or "[t]he fact that an expert may have neglected to perform

some 'essential' tests or measurements ... ***go[es] to the weight of his testimony, not its admissibility***." *Figueroa v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003)(citing *Lappe v. Am. Honda Motor Co.*, 857 F.Supp. 222, 228 (N.D.N.Y.1994))(emphasis added); see also *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)(noting failure to include variables will affect the analysis' probativeness, not its admissibility).

Thus, using facts with direct support in the record, and applying them to their methodology, Plaintiff's experts satisfied Rule 702 and *Daubert*, making their testimony sufficiently reliable, and their exclusion improper. The additional incident-specific analysis and investigation that the district court claims was missing would only serve to eliminate all other causes of injury, essentially asking the experts to be 100% certain of causation; that is not the standard. Instead, "[w]hile an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes..." *In re Fosamax Prods. Liab. Litig.*, 688 F. Supp. 2d 259 (S.D.N.Y. 2010) (quoting *Israel v. Spring Indus.,* No. 98 CV 5106, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006).

Here, of course, there is no way anyone can know with certainty what the foreign object was that contacted Sergeant Colwell's trigger, or the precise spot on the trigger which was contacted. The district court failed to consider that not every case will have circumstantial evidence like markings on the trigger that suggest the exact location of trigger pull force or some indication of the object like a key or pen

cap that could have slipped into the holster to actuate the trigger. The issue is whether Plaintiffs' experts have done enough analysis and testing, done enough research and located enough supporting objective data to support their opinion that design defects render the P320 uniquely susceptible to unintended discharge from a foreign object even when holstered, and the design defects—the single-action design, short trigger travel, and most critically the absences of any external or trigger safeties—were a substantial factor in causing Sergent Colwell's discharge. In this case, they did.

That the experts cannot opine as to precisely what pulled the trigger thus does not warrant their exclusion, nor does it render Plaintiffs' experts' causation opinion speculative where their respective opinions are based upon, *inter alia*, extensive experience and knowledge, sufficient factual bases, extensive testing and analyses, and objective data. Both experts reviewed Michal Colwell's depositions testimony where he unequivocally states his finger was not on the trigger and his hand was not on the gun when it discharged. Both experts reviewed video evidence of this same thing happening to other law enforcement officers, as well as sworn deposition testimony where other officers and civilians claimed to experience the same issue. The data from the Immigration and Customs Enforcement demonstrates a five-fold increase in unintended discharges, among the same user population of ICE Agents, with the only variable being the switch from the Glock to a P320—which is a single action gun with a short trigger travel, and critically has no trigger safety. The design

54

defects are responsible for the P320 discharging in its holster, time and time again, without the user's hand touching the gun. The design defect opinions inform the Plaintiff's expert's causation opinions which are confirmed by their testing, analysis, and review of the record evidence here.

*Daubert* cautioned against the level of scrutiny performed by the district court that would make prosecuting a design defect case like this never go to a jury. In *Daubert,* the United States Supreme Court cautioned against district courts being "overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469 (1993).

Therefore, to the extent Sig Sauer will argue that Dr. Vigilante and Mr. Tertin's causation opinions are flawed, lack adequate analysis, are speculative, or are unsupported by sufficient data, the proper means to attack their admissible causation opinions is through cross examination and presentation of contrary evidence. Excluding their causation opinions was an abuse of discretion and must be reversed.

**D. Even if This Court Finds the Exclusion of the Experts was Not an Abuse of Discretion, Plaintiffs' Claims Still Survive Summary Judgment.**

Summary judgment is only proper where the trial court, drawing all reasonable inferences in favor of the non-moving party (here, Plaintiffs), finds that there are no genuine issues of material fact. *Matsushita Electric Co.*, 475 U.S. 587 (1986).

As previously mentioned, the trial court's decision to grant summary judgement was erroneously and solely based on the exclusion of Plaintiffs' experts' causation opinions. In coming to its decision, the district court found that Plaintiffs could not prove causation through circumstantial evidence alone, without expert testimony. This approach, however, is inconsistent with the governing law. "It is not necessary that any particular element of a prima facie case be proved by expert testimony, ***only that each element be proved by admissible evidence***." *Castaldi v. Land Rover N. Am., Inc.*, No. 06 Civ. 1008, 2007 WL 4165283, at *10 (E.D.N.Y. Nov. 21, 2007; see also, *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 45 (2d Cir. 2002)(emphasis added); see also V*oss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 110–11, 450 N.E.2d 204, 209 (1983)(" "Expert testimony with reference to proximate causation is not always required…."). Despite this, the trial court stated that since "the mechanics of a P320 firearm are not within the common knowledge of a lay person[,]" expert testimony was required for the jury to reach an opinion on causation. *See* A401.

It is not disputed that the design defect opinions of Plaintiff's experts were unchallenged at the district court level. Thus, the issue is whether a jury armed with a thorough and detailed understanding of the workings of the P320, an

understanding of the difference in the function and safety of a double-action and single-action gun, and an understanding of the function and utility of a tabbed trigger, can make a determination as to whether the design defects were the cause of Sergent Colwell's unintended discharge. The jury is not only capable of doing so, but our legal system requires that they do so. *See Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996) (in determining summary judgment "the court should not weigh evidence or assess the credibility of witnesses [because] [t]hese determinations are within the sole province of the jury.")

When making all reasonable inferences in favor of Plaintiffs, it is without question that a rational jury could find in their favor, with or without the aid of expert testimony regarding causation. The jury will be presented with the direct record evidence of Sergent Colwell's testimony, and will be able to view the gun in its holster, allowing it to assess and confirm that there was a gap in the trigger guard when the gun was in its holster, leaving the sides of the P320 trigger exposed. The jury will also have the benefit of substantial circumstantial evidence that proves the unique design of the P320—single action, short trigger, no external safeties—is what makes it susceptible to unintended discharges even when secured in its holster. The data from ICE demonstrates the immediate and substantial increase in unintended discharges when the agency switched from the Glock to the P320. Additionally, Plaintiff has produced six (6) videos of law enforcement officer's P320's discharging, while holstered, without the officer touching the gun—the exact

57

scenario that Sergent Colwell experienced, and which multiple courts have deemed admissible at trial—most recently by the District Court of Massachusetts in *Catatao v. Sig Sauer.*

Sig Sauer claims the P320 cannot discharge without a trigger pull. As such, an object other than the user's finger necessarily must have caused the unintended discharge in the six OSI videos and in Sergent Colwell's incident. Importantly, Colwell's holster provided access to the trigger guard by a foreign object as depicted below. This fact only further demonstrates that a foreign object could have contacted the Sergent Colwell's trigger when holstered. *See below.*



***Sergent Colwell's P320 in the Subject Holster***

With rare exception, after an unintended discharge the user does not know why the gun discharged, or what foreign object—a key, bunched clothing, a pen cap, or *any other* object—made contact with their trigger. What Plaintiffs' experts do know, based on their extensive research and analyses, is this happens with alarming

frequency[7] with the P320. Plaintiffs' experts have identified the defects that explain why the P320 is prone to unintended discharge by a foreign object. Plaintiff's experts' design-defect opinions demonstrate that the P320 is more susceptible to unintended discharge by a foreign object due to the short trigger travel, the single-action design, and the lack of a trigger safety. These unchallenged opinions are not only supported by objective data, but also will assist the jury in making its causation determination. The causation determination of whether a tabbed trigger would have prevented a foreign object from actuating the trigger of Sergent Colwell's holstered P320 must be resolved by the jury and the jury alone.

This Court should follow the holding of the United States Court of Appeals, Sixth Circuit, in their recent decision in *Davis v. Sig Sauer,* No. 24-5210, 2025 WL 304340 (6th Cir. Jan. 27, 2025). There, the Sixth Circuit reversed the grant of summary judgment in an unintended discharge case involving the P320, and involving the same experts as this case. As will be explained further below, the Sixth Circuit held that, even without the causation opinions of Mr. Tertin and Dr. Vigilante, the jury can make its own causation determination based upon the facts, evidence and testimony. *Davis v. Sig Sauer, Inc.,* No. 24-5210, 2025 WL 304340, at *10 (6th Cir. Jan. 27, 2025).

---

[7] Plaintiff and his experts area aware of over 160 incidents of the P320 discharging without the user wanting it to. *See Bevaqua et al v. Sig Sauer.* A659-803.

The *Davis* case has similar facts to the case at bar. On January 23, 2021, Timothy Davis inadvertently shot himself in the leg with his Sig Sauer P320 while he was getting out of his truck. Davis's P320 pistol was fully holstered at the time of the shooting and that he testified that he did not pull the trigger. Davis brought product liability claims under Kentucky law against Sig Sauer, alleging the P320 was defectively designed because it was unreasonably likely to fire inadvertently, reasonable alternative designs exist that could make the P320 safer for consumers, and those alternative designs would have prevented his injury. At the district court level, Sig Sauer brought motions to exclude Davis's experts', Tertin and Vigilante's, causation opinions and moved for summary judgment, which the district court granted.

Notably, the district court in *Colwell* relied upon the now reversed district court opinion in *Davis v. Sig Sauer*, No. 3:22-cv-00010-GFVT, 2024 WL 54595 (E.D. Ky. Jan. 4, 2024). The district court here granted summary judgment after excluding Tertin and Vigilante's causation opinions, reasoning that "the mechanics of a P320 firearm are not within the common knowledge of a lay person. ***As another district court noted***, '[t]he inner workings and mechanics of the P320 are not matters of general knowledge, but instead involve a complex and technical understanding of firearms, engineering, and physics to fully determine whether a defect exists.'" *See Colwell* Summary Judgment Opinion A401 (emphasis added), *quoting Davis*, 2024 WL 5495, at *5.

On January 27th, 2025, the Sixth Circuit Court of Appeals issued its order, reversing the district court's grant of summary judgment in *Davis*. *See* A825-863. The Sixth Circuit held that while the expert's causation opinions remain excluded, their design-defect opinions were admissible and when the design defects of the P320 were explained to the jury, its causation determination was not complex and did not require any expert testimony. *Id.*, A845. The Sixth Circuit explained its reversal of the grant of summary judgment as follows:

> This case is not extraordinarily complex. In particular, expert testimony is unnecessary to determine causation in this case. Whether Davis inadvertently pulled the trigger through either a side-pull or a graze, and whether any of the safety mechanisms described by Tertin and Vigilante would have prevented the gunshot, are not complex questions that require expert testimony. Undoubtedly, the inner workings of the P320 are complex and an expert is necessary to explain those complexities. Once the P320's design and functioning is explained, however, the question of whether Sig Sauer's design choices substantially factored into Davis's trigger actuating in such a way that one of the proposed alternative safeties would have been effective is not complicated. A juror can assess Davis's veracity concerning how the discharge occurred and contrast it with the police report, witness testimonies, and the physical evidence.
>
> …
>
> Based on this evidence, applying common-sense principles, a juror could adequately reason whether the P320's lack of an external safety mechanism as described by Davis's experts was a substantial factor in bringing about the gunshot injury. This type of simple, common-sense reasoning fits squarely within the realm of the trier of fact.

*Id.*

Similarly, the issue of causation with respect to Sergent Colwell's case is not complex. The record establishes that Sergeant Colwell's P320 discharged while fully holstered, without his finger making contact with the front of the trigger; his direct testimony establishes this, as does the physical evidence of his holstered P320 with a gap in the trigger guard, as do the six Other Similar Incident videos. There is no eyewitness who contradicts Sergent Colwell's testimony.

Defendants did not challenge Plaintiffs' experts' design defect opinions at the district court level. Meaning, testimony would be presented with evidence and testimony about the function of the tabbed trigger, how it works, its size and shape, and would be able to compare the tabbed trigger on Glock versus the trigger of the P320 without a trigger safety. The jury will also hear testimony about the short trigger travel distance and the single-action design of the P320 which are again, design defect opinions that Sig Sauer did not challenge, and the district court did not exclude. When the jury hears admissible testimony about the design of the P320 as compared to competitor striker-fired guns, and the defects in the trigger (the short travel, single-action, and safetyless design) they can assess and determine whether those design defects were a substantial factor in causing Sergent Colwell's unintended discharge.

Just as the Sixth Circuit in *Davis* explained, "A juror applying his or her own common sense could assess whether Davis pulled the trigger of his P320 in such a way that a tabbed trigger or grip safety could have prevented the inadvertent

gunshot[;]" and the same is true here. *Id.,* A846. Even without expert testimony, Plaintiffs have put forth substantial evidence to establish that the P320 is defectively designed. This evidence spans testing of the subject gun and exemplar guns showing the single-action design, records from ICE showing a stark and substantial increase in unintended discharges from the P320 compared with the Glock with a tabbed trigger, six incident videos showing the P320 can and will discharge in its holster without the user touching the gun (corroborating Sergent Colwell's testimony), and an exhaustive comparative analysis between the P320 and its competitors showing it is the only gun of its kind with a single-action design and no external safeties. Plaintiffs' experts have each proffered admissible and unchallenged opinions regarding the P320's design defects. Even if this Court affirms the exclusion of their causation opinions, the question of causation must be left to the jury and there is substantial record evidence supporting a jury's finding that the design defects of the P320 were a substantial factor in causing Sergent Colwell's unintended discharge.

Sergent Colwell is one of hundreds of law enforcement officers across the country who have experienced an unintended discharge with the P320. It is the role of the jury to determine whether Plaintiffs can prove the design defects of the P320 caused his injuries. The law requires a jury resolve the factual disputes in this case. Given that genuine issues of material fact exist, the trial court's decision to award Defendant summary judgment must be reversed.

## VI.    CONCLUSION

This Court should reverse the trial court's rulings: (1) excluding the testimony of Davis's experts as to the issue of causation, and (2) granting summary judgment on behalf of Sig Sauer because the trial court abused its discretion in determining whether the experts' opinions were reliable and failed to properly apply the summary judgment review standard.

Respectfully submitted,
Attorneys for Appellant

**SALTZ MONGELUZZI & BENDESKY P.C.**

BY:    */s/ Robert W. Zimmerman*
Robert W. Zimmerman
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
(215) 496-8282 (Telephone)
rzimmerman@smbb.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

**1. Type-Volume**

This document complies with the word limit of FRAP because, excluding the parts of the document exempted by FRAP 32(f), this document contains less than 14,000 words.  This brief contains 13,942 words.

**2. Typeface and Type-Style**

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

BY:  */s/ Robert W. Zimmerman*
      Robert W. Zimmerman
      Attorneys for Appellant

## **CERTIFICATE OF SERVICE**

I, Robert W. Zimmerman, certify that I have filed the foregoing document on this Court's electronic case management system where it is available for viewing and download by all counsel of record, which constitutes good service. I have also furnished copies electronic copies of the videos referenced herein by flash drive to the Second Circuit and to Defendant's counsel of record.

BY: *_/s/ Robert W. Zimmerman_*
Robert W. Zimmerman
Attorneys for Appellant

February 13, 2025