# 24-2724(L), 24-3047(CON)

## United States Court of Appeals
### for the
## Second Circuit

MICHAEL COLWELL, H/W, JULIA COLWELL, H/W,

*Plaintiffs-Appellants,*

– v. –

SIG SAUER, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

ROBERT L. JOYCE
LITTLETON JOYCE UGHETTA & KELLY LLP
4 Manhattanville Road, Suite 202
Purchase, New York 10577
(914) 417-3400

– and –

ERIC G. LASKER
BRETT F. CLEMENTS
HOLLINGSWORTH LLP
1350 I Street NW
Washington, District of Columbia 20005
(202) 898-5800

*Attorneys for Defendant-Appellee*

CP COUNSEL PRESS   (800) 4-APPEAL • (381541)

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee Sig Sauer, Inc. certifies the following pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure:

Sig Sauer, Inc. is owned by Sig Sauer US Holding LP, which in turn is owned by L&O Finance GmbH. No publicly held corporation owns 10% or more of the stock of Sig Sauer, Inc.

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................ iii

JURISDICTIONAL STATEMENT ..................................................1

ISSUES PRESENTED FOR REVIEW ..............................................2

STATEMENT OF THE CASE ..........................................................3

    I.      The Sig Sauer P320 Pistol ..................................................4

    II.    Mr. Colwell's Accident ......................................................6

    III.   The Colwells' Experts Mr. James Tertin and Dr. William
         Vigilante ............................................................................8

         A.    Vigilante's and Tertin's General Causation Opinions ..............10

         B.    Vigilante's and Tertin's Specific Causation Opinions .............12

    IV.   Testing of Mr. Colwell's Pistol Conducted by Sig Sauer's
         Expert ..............................................................................14

SUMMARY OF ARGUMENT ........................................................15

ARGUMENT ..................................................................................18

    I.      STANDARD OF REVIEW .................................................18

    II.    LEGAL STANDARDS........................................................19

         A.    Amended Rule 702........................................................19

         B.    Summary Judgment ................................................25

    III.   THE DISTRICT COURT ACTED WITHIN ITS
         DISCRETION IN CONCLUDING THAT THE COLWELLS
         FAILED TO MEET THEIR BURDEN TO ESTABLISH
         THE ADMISSIBILITY OF THEIR EXPERTS'
         TESTIMONY UNDER RULE 702 ....................................26

         A.    The Colwells' Expert Testimony Does Not Meet the
            Rule 702 Fit Requirement Because New York Law
            Does Not Permit a Design Defect Claim When a
            Purchaser Declines an Optional Safety Device ........................26

         B.    The Colwells Have Not Shown That Their Experts'
            Testimony Satisfies The Rule 702 Reliability
            Requirements ..............................................................30

i

1. Dr. Vigilante's and Mr. Tertin's general causation opinions are not grounded in sufficient facts and are unreliable ...................................................31

2. Dr. Vigilante's and Mr. Tertin's specific causation opinions are not grounded in sufficient facts and are unreliable ...................................................36

    a. Dr. Vigilante failed to conduct any case-specific investigation and does not exclude alternative causes of Mr. Colwell's accident ................................................37

    b. Mr. Tertin's specific causation opinion relies solely on general conclusions and speculation unrelated to the facts surrounding Mr. Colwell's accident....................41

    c. The District Court did not abuse its discretion in concluding that Mr. Colwell's experts' failure to conduct fact-specific testing rendered their specific causation opinions unreliable ...............................44

IV. WITHOUT THE TYPE OF ADMISSIBLE EXPERT CAUSATION TESTIMONY REQUIRED UNDER NEW YORK LAW, THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT FOR SIG SAUER...............47

    A. New York Law Requires Expert Testimony To Establish Causation In This Complex Design Defect Case .......................................................................47

    B. The Specific Causation Analysis In This Case is Highly Technical and Requires Expert Testimony...................49

V. THE DISTRICT COURT PROPERLY CONSIDERED ALL OF THE FACTS AND ARGUMENTS ENCOMPASSED BY THE COLWELLS' RESPONSE TO SIG SAUER'S STATEMENT OF UNDISPUTED MATERIAL FACTS.................53

CONCLUSION .......................................................................56

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ............................................................ 19, 24, 30, 36

*Auto. Ins. Co. of Hartford v. Electrolux Home Prods., Inc.*,
No. 08-CV-00623(A)(M), 2010 WL 3655743
(W.D.N.Y. Sept. 15, 2010) ............................................................ 40, 45

*Barrett v. Black & Decker (U.S.) Inc.*,
2008 WL 5170200 (S.D.N.Y. Dec. 9, 2008) ....................................................48

*Biss v. Tenneco Inc.*,
64 A.D.2d 204 (N.Y. App. Div. 1978) ........................................................ 27, 28

*Bustamante v. KIND, LLC*,
100 F.4th 419 (2d Cir. 2024) ........................................................ 18, 19, 23, 25

*Castaldi v. Land Rover N. Am., Inc.*,
No.06-CV-1008JGKAM, 2007 WL4165283
(E.D.N.Y. Nov. 21, 2007) ....................................................52

*Celotex v. Catrett*,
477 U.S. 317 (1986) ....................................................25

*Daubert v. Merrell Dow Pharms. Inc.*,
509 U.S. 579 (1993) ........................................................ 23, 30

*Davis v. Sig Sauer, Inc.*,
126 F.4th 1213 (6th Cir. 2025) ....................................................52-53

*Deutsch v. Novartis Pharmaceutical Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) ....................................................39

*Doe ex rel. Doe v. Whelan*,
732 F.3d 151 (2d Cir. 2013) ....................................................55

*Donnelly v. Ford Motor Co.*,
80 F. Supp. 2d 45 (E.D.N.Y. 1999) ....................................................23

*Geddes v. Crown Equip. Corp.*,
273 A.D.2d 904 (N.Y. App. Div. 2000) ........................................................ 28, 29

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................ 22, 23, 39

*Glowczenski v. Taser Int'l, Inc.*,
    928 F. Supp. 2d 564 (E.D.N.Y. 2013),
    *aff'd in part, dismissed in part,* 594 F. App'x 723 (2d Cir. 2014) ............... 30, 31

*Guarascio v. Drake Assocs. Inc.*,
    582 F. Supp. 2d 459 (S.D.N.Y. 2008) .................................................... 17, 37, 47

*In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,
    707 F. Supp. 3d 309 (S.D.N.Y. 2023) ........................................................ 24, 35

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-CV-5810, (JMF), 2017 WL 6729295
    (S.D.N.Y. Dec. 28, 2017) ...................................................................... 25, 42, 45

*In re Mirena IUD Levonorgestrel-Related Prods. Liab. Litig.*,
    982 F.3d 113 (2d Cir. 2020) .................................................... 19, 23, 24, 31, 46

*In re Mirena IUD Prods. Liab. Litig*,
    202 F. Supp. 3d 304 (S.D.N.Y. 2016),
    *aff'd,* 713 F. App'x 11 (2d Cir. 2017) ........................................................ *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-MD-01570 (GBD)(SN), 2024 WL 5077293
    (S.D.N.Y. Dec. 11, 2024) ........................................................................ *passim*

*Israel v. Spring. Indus., Inc.*,
    98-CV-5106, 2006 WL 3196956 (E.D.N.Y. Nov. 3, 2006) ................................ 39

*Jackson v. Bomag GmbH*,
    225 A.D.2d 879 (N.Y. App. Div. 1996) ............................................................ 28

*Jinn v. Sig Sauer, Inc.*,
    No. 20CV1122PGG RWL, 2023 WL 2919558
    (S.D.N.Y. Apr. 12, 2023), *rep. and rec. adopted sub nom.*,
    *Jinn v. Sig Sauer Inc.*, No. 20CIV1122PGGRWL,
    2023 WL 5972507 (S.D.N.Y. Sept. 13, 2023) ........................................... *passim*

*Mancuso v. Consol. Edison Co. of N.Y., Inc.*,
    967 F. Supp. 1437 (S.D.N.Y. 1997) ............................................................. 39-40

*Martins v. The Sherwin-Williams Co.*,
    No. 22-CV-3520 (BMC), 2024 WL 694082
    (E.D.N.Y. Feb. 20, 2024) .................................................... 17, 25, 47, 48

*Martins v. The Sherwin-Williams Company et al.*,
No. 22-cv-3520, 2024 WL 641383, at *1 (E.D.N.Y. Jan. 10, 2024) .................37

*Miss. Publ'g Corp. v. Murphree*,
326 U.S. 438 (1946) ................................................................................ 20-21

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
676 F.3d 521 (6th Cir. 2012) .................................................................33

*Pahuta v. Massey-Ferguson, Inc.*,
170 F.3d 125 (2d Cir. 1999) ................................................... 16, 26, 27

*Picard Tr. For SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs.*,
49 F.4th 170 (2d Cir. 2022) ...................................................................19

*Pierre v. Hilton Rose Hall Resort & SPA*,
No. 14 CIV. 3790 (VMS), 2016 WL 4742281
(E.D.N.Y. Sept. 12, 2016) ............................................................ 48, 51

*Rainbow v. Albert Elia Bldg. Co.*,
79 A.D.2d 287 (N.Y. App. Div. 1981) ........................................ 28, 29

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ....................................................... *passim*

*Scarangella v. Thomas Built Buses, Inc.*,
93 N.Y.2d 655 (1999) .................................................................. 28, 29

*Schiavone v. Fortune*,
477 U.S. 21 (1986) ..................................................................................21

*Speller ex rel. Miller v. Sears, Roebuck & Co.*,
100 N.Y.2d 38 (2003) ............................................................................52

*Torres v. Oakland Scavenger Co.*,
487 U.S. 312 (1988) ..............................................................................20

*Voss v. Black & Decker Mfg. Co.*,
59 N.Y.2d 102 (1983) ............................................................................52

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) ....................................................................... 19-20

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ......................................................................................2

28 U.S.C. § 1332 ................................................................2

Advisory Comm. on Evidence Rules,
    *Minutes of the Meeting of Nov. 13, 2020* ...........................21

Fed. R. App. P. 4(a)(1)(A) ............................................1, 2

Fed. R. Civ. P. 56(a) .......................................................25

Fed. R. Civ. P. 56(c) .......................................................59

Fed. R. Civ. P. 56(c)(1) ...................................................25

Fed. R. Civ. P. 702 .........................................................20

Fed. R. Evid. 104(a) .......................................................21

Fed. R. Evid. 702 ................................................. *passim*

Fed. R. Evid. 702(a) .......................................................26

Fed. Ref. Manual of Scientific Evid., Ref. Guide on Eng'g (3d ed. 2011) ............44

Guido Calabresi & Jon T. Hirschoff,
    *Toward a Test for Strict Liability in Torts,* 81 Yale L.J. 1055 (1972) .................27

Jud. Conf. Comm. on Rules of Practice and Procedure,
    *Comm. Note to Rule 702* (Oct. 19, 2022) ............................21

Mem. For Hon. John D. Bates from Hon. Patrick J. Schiltz,
    Rep. of the Advisory Comm. on Evidence Rules, *Rep.*
    *to the Standing Comm.* (May 15, 2022) ............................22

## JURISDICTIONAL STATEMENT

On September 17, 2024, the United States District Court for the Northern District of New York entered a Decision and Order properly excluding the expert opinions of Dr. William Vigilante and Mr. James Tertin, experts for the Appellants, Michael Colwell and Julia Colwell ("the Colwells"). A386-404. In the absence of admissible expert testimony to establish causation, the district court granted summary judgment for Appellee Sig Sauer, Inc. ("Sig Sauer") as to the Colwells' claims for Strict Product Liability and Negligence. The court noted that the Colwells' five additional claims may be "subject to dismissal for the same reason," but because the parties did not specifically brief these claims, the court did not resolve them. A403. The court ordered the parties to confer and "file a status report concerning how they would like to proceed with respect to the remaining claims" of (i) breach of implied warranty of merchantability, (ii) breach of express warranty, (iii) negligent infliction of emotional distress, (iv) intentional infliction of emotional distress, and (v) loss of consortium. A403.

Plaintiffs filed their first notice of appeal on October 15, 2024, within the thirty days permitted under Fed. R. App. P. 4(a)(1)(A). On October 17, 2024, the parties filed their Joint Status Report requesting that the Colwells' five remaining claims be dismissed, in addition to the court-ordered dismissal of their claims for strict product liability and negligence, "with Plaintiffs' counsel confirming their

intent to appeal the decisions." Joint Status Report 1, ECF No. 78. The Report notes that "[b]ased on the Court's exclusion of Plaintiffs' proffered liability experts James Tertin and William Vigilante, the remaining claims, each of which includes causation as an essential element, are also subject to dismissal." *Id.* at 2.

On October 18, 2024, the court dismissed all of Plaintiffs' claims and entered final judgment in favor of Sig Sauer. A405.

On November 18, 2024, Plaintiffs filed their second notice of appeal, within the thirty days permitted under Fed. R. App. P. 4(a)(1)(A). Appellate jurisdiction is proper under 28 U.S.C. § 1291 because this is an appeal from a final decision of the district court. The United States District Court for the Northern District of New York had diversity jurisdiction under 28 U.S.C. § 1332.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court acted within its discretion in excluding the causation opinions of the Colwells' expert witnesses because they did not meet the relevance and reliability requirements of Federal Rule of Evidence 702 to establish either general causation or specific causation?

2.     Whether the district court properly granted summary judgment in favor of Sig Sauer because the Colwells failed to proffer admissible expert testimony to establish general and specific causation?

3.     Whether the district court acted within its discretion in its review of the

2

factual evidence as presented in the Statements of Undisputed Materials Facts of the parties and related briefing in the underlying motion?

## STATEMENT OF THE CASE

Appellants Michael Colwell and Julia Colwell allege that Mr. Colwell was injured when his P320 pistol manufactured by Appellee Sig Sauer, Inc. accidentally discharged while in its holster during police training. The Colwells offered testimony from two causation experts who opined that the P320 was defectively designed because it did not come equipped with external safeties and that this design defect was the cause of Mr. Colwell's injury. The district court excluded the Colwells' experts because they offered no factual bases for their claims of a causative design defect and because they failed to conduct any investigation into – or offer any opinion as to – what physically caused Mr. Colwell's P320 to discharge. In the absence of admissible expert testimony as to causation, the district court granted summary judgment for Sig Sauer.

The Colwells now appeal, but they provide no basis for this Court to conclude that the district court abused its discretion in excluding their experts. And the Colwells' claim that they can establish causation without expert testimony is contrary to New York product liability law and the highly technical issues underlying their causation arguments.

3

## I.     The Sig Sauer P320 Pistol

Sig Sauer manufactures firearms for sale to the military, law enforcement, and civilians. In 2014, Sig Sauer began selling the semi-automatic P320 model pistol, a striker-fired pistol with a modular design that allows users to modify the grip size and caliber. SA007-008, Watkins Report at 4-5. The company manufactures more than 16 models of the P320, including a line that customers can customize. SA008, *Id*. at 5. The P320 is designed with internal safety features, a striker safety lock and a striker-sear engagement, that prevent accidental discharges from occurring without the trigger being pulled. A154, Farkas Dep., *Powers*, at 60:17-61:3; SA010-013, SA016-017, SA027, Watkins Report at 7-10, 13-14, 24.

Purchasers of the Sig Sauer P320 also have the option to equip the handgun with a manual external safety, known as a "thumb safety," which the user switches on and off with his or her thumb. A200, Tertin Report at 12-13. When a thumb safety is switched to the "on" position, the handgun will not fire. However, many law enforcement agencies require that service firearms *not* be equipped with a manual safety to ensure a rapid response in crisis situations. SA028, SA032, Watkins Report at 25, 29. Private handgun purchasers also have the choice whether to equip their handguns with thumb safeties based on their personal protection needs. SA031, *Id*. at 28.



Sig Sauer P320 models with and without a manual thumb safety.
SA031, Watkins Report at 28.

The Sig Sauer P320 has a balanced trigger mechanism that significantly reduces the risk of an accidental discharge when a handgun is dropped. SA029-030, *Id.* at 26-27. Some competitor handguns have unbalanced trigger mechanisms, which are prone to discharging when dropped. To protect against this risk, these types of handguns include another type of safety called a tabbed trigger. SA028-031, *Id.* at 25-28; A154, Farkas Dep., *Powers*, at 61:11-22. As the Colwells' experts acknowledge, unlike a manual thumb safety, a tabbed trigger will not prevent a handgun from accidentally discharging if the trigger is pulled. A423-424, Tertin

Dep., *Colwell*, at 20:4-10, 22:2-5; SA002-003, Vigilante Dep., *Northrop*, at 42:14-43:1.[1]



Glock-manufactured firearm with a tabbed trigger safety.
A203, Tertin Report at 15.

## II.    Mr. Colwell's Accident

Mr. Colwell's employer, the Troy Police Department, purchased the P320 as the standard issue sidearm for its police officers. A028-029, M. Colwell Dep. at 24:14-18, 25:13-21. The Troy Police Department elected to purchase P320s without a manual thumb safety and issued a P320 to Mr. Colwell for police use. *See* A397, District Ct. Op. at 12 n.4; SA030, Watkins Report at 27 ("SIG Sauer gives its

---

[1] The Colwells' experts reference a third type of safety in their reports called a grip safety, but they do not offer any substantive opinions that this type of safety would have prevented the accidental discharge in this case. *See* A121, Vigilante Report at 14; A200, Tertin Report at 12. Appellants likewise do not meaningfully discuss grip safeties in their opening brief.

customers the opportunity to choose if their P320 should include a manual safety or not."); SA028, *Id.* at 25 ("Troy Police Department . . . made the decision to purchase P320 pistols without manual safeties and assign these pistols to its officers, including Mr. Colwell."); SA005, *Id.* at 2 ("the Troy Police Department could have purchased SIG P320 pistols equipped with manual safeties but chose the SKU of SIG P320 that did not contain a manual safety."); *see also* A247, Sig Sauer, Inc.'s Mem. in Supp. of Mot. to Exclude William Vigilante at 2 n.1 (noting "the Troy Police Department, selected the P320 model pistol without an external manual thumb safety even though a manual thumb safety was (and still is) an available option on the P320."). Of note, Mr. Colwell made a similar decision outside the job, purchasing a Ruger pistol for personal use that does not "ha[ve] any kind of safety thing; it's point and go with that." A029, A035, M. Colwell Dep. at 28:2-16; 49:6-10.

Mr. Colwell's right leg was injured on June 2, 2021 at a Troy Police Department training facility when he accidentally discharged his department-issued P320 pistol. A036, M. Colwell Dep. at 54:13-56:10. Mr. Colwell's account of the accident does not conform with independent investigation reports or with his own experts' opinions. Mr. Colwell claims that he was reaching across his body for his taser, that he did not pull the trigger of his P320, and that the sidearm was in its holster at the time of the accidental discharge. A039, *Id.* at 66:5-67:10.

However, emergency responders reported that Mr. Colwell's pistol discharged when "he attempted to holster his sidearm…" SA035, Hoosic Valley Rescue Squad EMS Report at 1. Similarly, the Troy Police Department Incident Report indicates Mr. Colwell's pistol discharged "[w]hile manipulating his firearm during said training…" SA038, Troy Police Department Incident Report at 1. And as noted below, the Colwells' experts acknowledge that the P320 would not have fired if the trigger had not been pulled.

## III. The Colwells' Experts Mr. James Tertin and Dr. William Vigilante

The Colwells disclosed Mr. Tertin (gunsmithing) and Dr. Vigilante (human factors and ergonomics) to offer expert opinions as to the cause of Mr. Colwell's accident. A387, District Ct. Op. at 2. Both testified that something must have pulled the trigger on Mr. Colwell's P320 to make it discharge. A420, Tertin Dep., *Colwell,* at 7:4-10; A503, Vigilante Dep., *Colwell,* at 19:20-20:7. Despite being retained to opine as to the cause of Mr. Colwell's accident, however, both experts concede that that they do not know what pulled the P320 trigger, and they conducted no investigation as to potential alternative causes before reaching their opinions. A420, Tertin Dep., *Colwell*, at 7:11-22; A503-504, Vigilante Dep., *Colwell*, at 20:13-24:1. Not only do they not know what pulled the trigger, but they also do not know where the trigger was contacted and speculate further that perhaps an unknown force contacted the holstered trigger only on its side, rather than in the center where a

8

tabbed trigger safety would be located. *See* A503-506, Vigilante Dep., *Colwell*, at 20:13-22:19, 28:19-29:6; SA003-004, Vigilante Dep., *Northrop*, at 42:14-43:22; A121, Vigilante Report at 10; A420, Tertin Dep., *Colwell*, at 7:14-17; A202-203, Tertin Report at 14-15.

Notwithstanding these analytical gaps, Tertin and Vigilante both opine that an external safety would have prevented the accident, and that the P320 used by Mr. Colwell was defective because it was not equipped with an external safety. A387, District Ct. Op. at 2. They failed, however, to connect those opinions to the facts in this case. Tertin and Vigilante do not dispute that the P320 is offered with an optional manual thumb safety. *See* A397, District Ct. Op. at 12 n.4; SA026-032, Watkins Report at 23-29. Nor do they dispute that the Troy Police Department elected for sound reasons not to equip the P320 with such a device. Tertin and Vigilante also acknowledge that a tabbed trigger safety will not prevent a handgun from discharging when the trigger is pulled. A423-424, Tertin Dep., *Colwell*, at 20:2-10, 22:2-5; SA002-003, Vigilante Dep., *Northrop*, at 42:14-43:1; A491-493, Tertin Dep., *Herman*, at 91:11-18; 92:4-6; 96:7-19; 97:4-17, 98:16-22. And neither expert conducted any testing to validate their hypothesis that Mr. Colwell's P320 would not have discharged if it had been equipped with a tabbed trigger. A392, District Ct. Op. at 7; A509, Vigilante Dep., *Colwell*, at 42:14-43:17; A423, Tertin Dep., *Colwell*, at 18:2-20:10.

9

### A. Vigilante's and Tertin's General Causation Opinions

Tertin and Vigilante both contend that the P320 is more prone to accidental discharges than competitor handguns equipped with external safeties. A205, Tertin Report at 17-18; A118-123, Vigilante Report at 11-16. Notably, however, neither expert came forward with any comparative data to support their contention. A425, Tertin Dep., *Colwell,* at 25:17-22; A553-554, Vigilante Dep., *Slatowski,* at 124:21-125:7, 126:3-127:12, 128:14-18. And it is undisputed that accidental discharges occur with all types of handguns, including those with tabbed triggers. A118, Vigilante Report at 11; A423-424, Tertin Dep., *Colwell,* at 20:4-10, 22:2-5; SA002-003, Vigilante Dep., *Northrop,* at 42:14-43:1.

Lacking reliable comparative data, Vigilante cites to anecdotal data such as videos from YouTube and one partially-redacted memorandum from U.S. Immigration and Customs Enforcement ("ICE"). A553-554, Vigilante Dep., *Slatowski,* at 124:21-125:7, 126:7-23. The ICE memorandum provides raw numbers on accidental discharges of P320s and other, sometimes unidentified, firearms from June 4, 2019 through November 2022, but it does not provide data that would allow for any meaningful interpretation of those raw numbers, such as, *e.g.,* the total number and types of sidearms in use by ICE during that period (*i.e.*, the denominators necessary to reach any opinion on relative incidence rates). *See* A183-184, U.S. Immigration and Customs Enforcement Mem. on Increase in ICE

10

Unintentional Discharges at 1-2; A185-188, *Id*. at 3-6; A554-555, Vigilante Dep., *Slatowski,* at 128:14-129:12.

Tertin's analysis was even more deficient. He made no attempt to research relative rates of accidental discharges among different pistols at all. *See* A425, Tertin Dep., *Colwell*, at 25:11-22. Remarkably, Tertin testified that his opinion would remain unchanged even if presented with evidence of hundreds of instances of unintentional discharges among handguns equipped with tabbed triggers or with data showing that pistols with tabbed triggers discharged unintentionally *three times as often* as the P320. A397, District Ct. Op. at 12; A424, Tertin Dep., *Colwell*, at 23:7-24:6; *see also* A479, Tertin Dep., *Herman*, at 41:15-44:19 (discounting a Washington Post article reporting more than 120 accidental discharges involving Glock pistols equipped with a tabbed trigger). Tertin instead seeks to support his opinion by arguing that the internal safeties in a P320 pistol can be deactivated with 1.5 pounds of trigger force. A199-200, A207 Tertin Report at 11-12, 19; SA021, Watkins Report at 18; A421-422, Tertin Dep., *Colwell*, at 11:17-15:8. But Tertin does not go the necessary next step to show that 1.5 pounds of force would cause the P320 pistol to discharge and agrees that a full trigger pull is needed. *See id*.; A191, Tertin Report at 3. Moreover, this purported evidence of greater safety with tabbed triggers ignores the fact that tabbed trigger safeties are likewise disengaged with less than 1.5 pounds of trigger force. SA021, Watkins Report at 18.

11

**B. Vigilante's and Tertin's Specific Causation Opinions**

As noted, both Tertin and Vigilante agree that something pulled the trigger of Mr. Colwell's pistol to cause the discharge, but they do not know what pulled it or how. *See* A420, A425, Tertin Dep., *Colwell*, at 7:4-13, 27:5-9; A503, A505, Vigilante Dep., *Colwell*, at 19:20-20:7, 20:13-18, 28:6-14.

Neither expert conducted any investigation to exclude alternative causes of Mr. Colwell's accident, *i.e.,* events that could have pulled the trigger on Mr. Colwell's P320 with force that would discharge the pistol with or without a tabbed trigger. Vigilante testified that he relied on Mr. Colwell's testimony and the Troy Police Department incident report in support of his opinion. A503, Vigilante Dep., *Colwell,* at 18:7-19. But Mr. Colwell did not offer any explanation as to what pulled the trigger of the P320 and, as noted above, the incident report, as well as the EMS report, contradict Mr. Colwell's deposition testimony that the pistol was holstered at the time it discharged. A039, M. Colwell Dep. at 66:5-67:10; SA038, Troy Police Department Incident Report at 1; SA035, Hoosic Valley Rescue Squad EMS Report at 1. And the police department incident report specifically found that Mr. Colwell was "manipulating" the P320 when it discharged. Vigilante did not inspect the holster or the P320 pistol, nor did he speak with Mr. Colwell or any witnesses regarding the incident. A392-393, District Ct. Op. at 7-8; A502, Vigilante Dep., *Colwell*, at 13:14-20. In his deposition, all that Vigilante could say was that it was

12

possible that a foreign object, clothing, a finger, or some other unknown item pulled the trigger. A503-504, Vigilante Dep., *Colwell,* at 20:8-18, 21:24-24:1.

Tertin likewise made only a cursory review of the record evidence. He read Mr. Colwell's testimony, "scanned" the incident report, and inspected the pistol.[2] A421, Tertin Dep., *Colwell*, at 10:13-24; A398, District Ct. Op. at 13. But Tertin did not inspect Mr. Colwell's holster and does not know what clothing Mr. Colwell was wearing at the time of the incident. A420-421, A423, Tertin Dep., at 5:3-14, 11:5-9, 17:1-3. He conceded further that he could not even say whether Mr. Colwell's hands were on or off of the pistol when it discharged. A421, Tertin Dep., *Colwell*, at 11:11-15. And while he purports (without valid basis as explained above) to rely on testing to claim that the P320 can discharge with a less forceful trigger pull than handguns that employ tabbed triggers, he made no effort to determine the amount of force that was applied to the trigger of Mr. Colwell's P320 to cause the discharge in this case. A420, A424-425, Tertin Dep., *Colwell*, at 7:18-22, 24:24-25:2.

---

[2] Tertin's report indicates that he inspected a P320 with serial number 58J109611, which "was represented to me…was the pistol that fired on Mr. Colwell." A191, Tertin Report at 3. Mr. Colwell's P320 had serial number 58C459878. SA004, Watkins Report at 1.

13

## IV.   Testing of Mr. Colwell's Pistol Conducted by Sig Sauer's Expert

In sharp contrast to Vigilante and Tertin, Sig Sauer's expert Mr. Derek Watkins conducted extensive testing on Mr. Colwell's P320 pistol to determine whether any defect in the gun could have caused the accident. Watkins subjected the pistol to CT scan and x-ray analysis to consider five safety factors and performed thirteen physical function tests to confirm the pistol operated properly. SA005-006, SA009, Watkins Report at 2-3, 6.

The CT scan and x-rays, analyzing all key mechanisms and movements, confirmed that there were no abnormalities in the fire control unit or foreign material that could interfere with the P320's function. SA009, *Id*. at 6. Likewise, the function testing confirmed that all component parts of the P320 interacted properly. SA019-020, *Id*. at 16-17. Each test was conducted at least five times.  SA020, *Id*. at 17. In every test, Mr. Colwell's pistol did not discharge in any of the physical testing unless the trigger was fully depressed. SA006, SA009, *Id*. at 3, 6.

As part of the battery of tests, Watkins conducted trigger pull actuation force testing, which uses weights to measure the force needed to pull the trigger and cause a discharge. SA020, *Id*. at 17. The five tests yielded an average of 6.425 pounds of force needed to fully depress the trigger. *Id*. The pistol never discharged when 6.25 pounds of force or less was used. *Id*.

14

## SUMMARY OF ARGUMENT

The district court acted well within its discretion in excluding the causation opinions of the Colwells' experts under Federal Rule of Evidence 702, and, in the absence of admissible expert testimony to establish causation, properly granted summary judgment for Sig Sauer. *See In re Mirena IUD Prods. Liab. Litig. ("Mirena I")*, 202 F. Supp. 3d 304, 327 (S.D.N.Y. 2016), *aff'd,* 713 F. App'x 11 (2d Cir. 2017) (granting summary judgment after exclusion of expert causation opinions).

In order to meet their burden of expert admissibility under Rule 702, the Colwells were required to establish that their experts provided testimony that (1) would help the trier of fact in answering a question relevant to a finding in favor of the plaintiff (also known as "fit"), and (2) was based on sufficient facts and the product of reliable principles and methods that were reliably applied to the facts of this case. The district court did not abuse its discretion in holding that the Colwells failed to meet this burden.

The Colwells' experts' opinion that alternative safety devices would have prevented Mr. Colwell's accident fails the Rule 702 fitness test because it disregards the record evidence that the Troy Police Department chose to purchase P320 pistols for its officers without an optional external safety. SA028, Watkins Report at 25. Providing purchasers the choice whether or not to equip handguns with external

15

safeties that might interfere with rapid response is not a design defect; it is a design option. A consumer choice to purchase a handgun without external safeties cannot create the basis for a design defect claim. *See Pahuta v. Massey-Ferguson, Inc.,* 170 F.3d 125, 133 (2d Cir. 1999) ("[A]s a matter of law, [a] product is not defectively designed and the manufacturer will not be held liable to a purchaser or a purchaser's employee who is injured while using the product without…optional equipment…"); *see also Sardis v. Overhead Door Corp.,* 10 F.4th 268, 294 (4th Cir. 2021) (expert's testimony pertaining to legal standard that was incompatible with governing law should have been excluded as irrelevant).

The Colwells' experts' testimony also failed the Rule 702 reliability test as to both general causation (that the P320 is more likely to accidentally discharge than other handguns) and specific causation (that the lack of an external safety was the cause of the accidental discharge in this case). *See Mirena I,* 202 F. Supp. 3d at 309. The experts offer no factual basis to opine that the incidence of accidental discharges with the P320 is any higher than the incidence of such discharges in other handguns with tabbed triggers, nor do they present any fact-specific testing to support their speculation that the lack of a tabbed trigger was the cause of the discharge in this case.

Both of the Colwells' experts acknowledge that something must have pulled the trigger on Mr. Colwell's P320 pistol to cause it to accidentally discharge, and

16

both experts acknowledge that they do not know what that something was. A420, Tertin Dep., *Colwell*, at 7:4-13; A503, Vigilante Dep., *Colwell*, at 19:2-20:7, 20:13-18; A505, Vigilante Dep., *Colwell,* at 28:6-14. The Colwells' human factors and ergonomics expert, Vigilante, conceded that he "did not personally inspect the holster or the pistol" at issue, or "conduct any formal testing" to attempt to verify how the discharge occurred. A392-393, District Ct. Op. at 7-8. And their gunsmithing expert Tertin's testing was so divorced from the specific factual circumstances of Mr. Colwell's discharge that it cannot provide any information to inform a specific causation opinion here.

Nor can the Colwells avoid summary judgment by arguing that they can establish causation without expert testimony. New York law requires "competent, non-conclusory expert testimony" to establish causation "[i]n virtually every products liability case where the alleged defect is not obvious," including cases involving complex machinery or equipment like the one at bar. *Martins v. The Sherwin-Williams Co.,* No. 22-CV-3520 (BMC), 2024 WL 694082, at *1, *3 (E.D.N.Y. Feb. 20, 2024); *Guarascio v. Drake Assocs. Inc.,* 582 F. Supp. 2d 459, 463-64 (S.D.N.Y. 2008); *see also, e.g., Jinn v. Sig Sauer, Inc.,* No. 20CIV1122PGGRWL, 2023 WL 5972507, at *16-17 (S.D.N.Y. Sept. 13, 2023) (granting summary judgment in P320 unintended discharge case because "firearms are not the type of product for which alternative designs are 'obvious and

17

understandable'" and without expert testimony "identifying defects and asserting causation" there is "no evidence that any design defect caused Jinn's accident.").

Finally, the Colwells' claim that they were prejudiced because the district court failed to adequately account for their responses to Sig Sauer's Statement of Undisputed Facts is likewise unavailing. All the purported "facts" and arguments in the Colwells' responses were also included in their briefing and other documents submitted in opposition to Sig Sauer's motions and were, therefore, properly considered, and rejected, by the district court. Moreover, none of the alleged facts or arguments the Colwells point to in any way alter the sound reasoning of the district court in granting Sig Sauer's motions.

The district court acted well within its discretion in concluding that the Colwells failed to establish the admissibility of their experts' causation opinions under Rule 702 and correctly recognized that their lack of any admissible causation opinion required summary judgment to be entered in favor of Sig Sauer. The district court's rulings should be affirmed.

## ARGUMENT

### I. STANDARD OF REVIEW

When a party "challenges the district court's evidentiary rulings underlying a grant of summary judgment," as the Colwells do here, Courts of Appeal "undertake a two-step inquiry." *Bustamante v. KIND, LLC,* 100 F.4th 419, 425 (2d Cir. 2024)

18

(quoting *Picard Tr. For SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs.*, 49 F.4th 170, 180-81 (2d Cir. 2022)). First, the Court will review a district court's rulings as to the admissibility of evidence for abuse of discretion. *Bustamante,* 100 F.4th at 426. Courts of Appeal are "highly deferential" when reviewing a district court's decision to admit or exclude expert testimony and recognize trial judges' "broad discretion" in evaluating the reliability of an expert's opinion. *Id.* at 426; *In re Mirena IUD Levonorgestrel-Related Prods. Liab. Litig. ("Mirena II"),* 982 F.3d 113, 122 (2d Cir. 2020). Excluding expert testimony is "not an abuse of discretion unless it is manifestly erroneous." *Bustamante,* 100 F.4th at 427 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002).

Second, "after we have defined the record, we review the summary judgment decision *de novo*." *Bustamante,* 100 F.4th at 425 (citation omitted).

## II.   LEGAL STANDARDS

### A. Amended Rule 702

On December 1, 2023, Federal Rule of Evidence 702 was amended to correct what the Federal Rule Advisory Committee identified as widespread failures by federal courts to properly hold proponents of expert testimony to the "exacting standards" of admissibility set forth in the Rule. *See Weisgram v. Marley Co.*, 528

U.S. 440, 455 (2000). As amended, Rule 702 now states as follows (new language

underlined; deleted language stricken):

### Rule 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise <u>if the proponent demonstrates to the court that it is more likely than not that</u>:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the ~~expert has reliably applied~~ <u>expert's opinion reflects a reliable application of</u> the principles and methods to the facts of the case.

In explaining the need for these amendments, the Advisory Committee

bemoaned that "many courts have held that the critical questions of the sufficiency

of an expert's basis, and the application of the expert's methodology, are questions

of weight and not admissibility." Fed. R. Civ. P. 702 advisory committee's note to

2023 amendment ("2023 Notes").[3] "These rulings are an incorrect application of

---

[3] *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312 (1988) (noting courts accord weight to Advisory Committee Notes when interpreting the Rules, citing *Miss.*

20

Rules 702 and 104(a)." *Id.*; *see also* Advisory Comm. on Evidence Rules, *Minutes of the Meeting of Nov. 13, 2020*, at 4 ("[F]ederal cases . . . revealed a pervasive problem with courts discussing expert admissibility requirements as matters of weight.").[4]

As explained in the Committee Note, the amendment to the first paragraph of Rule 702 was added "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Jud. Conf. Comm. on Rules of Practice and Procedure, *Comm. Note to Rule 702* at 228 (Oct. 19, 2022) (citing Fed. R. Evid. 104(a)).[5]

The second amendment to Rule 702 – requiring proponents of expert testimony to establish an expert's "reliable application" of his methodology to the facts of the case – was adopted "to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *See* 2023 Notes; *see also In re Terrorist Attacks on Sept. 11, 2001,* No. 03-MD-01570 (GBD)(SN), 2024 WL 5077293, at *3

---

*Publ'g Corp. v. Murphree*, 326 U.S. 438, 444 (1946)); *see also Schiavone v. Fortune*, 477 U.S. 21, 31 (1986).

[4] https://www.uscourts.gov/sites/default/files/ev_minutes_fall_2020_0.pdf.

[5] https://www.uscourts.gov/sites/default/files/2022_scotus_package_0.pdf.

(S.D.N.Y. Dec. 11, 2024). As the Committee Note explains, the judicial gatekeeping responsibility imposed in subsection 702(d) "is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *See* 2023 Notes.

The importance of the amendment to § 702(d) was further explained in the Advisory Committee's Report to the Standing Committee:

> The language of the amendment more clearly empowers the court to pass judgment on the conclusion that the expert has drawn from the methodology. Thus the amendment is consistent with *General Electric Co., v. Joiner*, 522 U.S. 136 (1997), in which the Court declared that a trial court must consider not only the expert's methodology but also the expert's conclusion; that is because the methodology must not only be reliable, it must be reliably applied.

Mem. For Hon. John D. Bates from Hon. Patrick J. Schiltz, Rep. of the Advisory Comm. on Evidence Rules, *Rep. to the Standing Comm.*, at 871 (May 15, 2022);[6] *see also In re Terrorist Attacks on Sept. 11, 2001*, 2024 WL 5077293, at *16 ("Of

---

[6] https://www.uscourts.gov/sites/default/files/evidence_rules_report_-_may_2022_0.pdf.

course, the Court may consider an expert's conclusions to determine whether his testimony reflects 'too great an analytical gap' between the underlying facts and the opinion" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Against this backdrop, courts must take a "hard look" at an expert's opinions to ensure it "both rests on a reliable foundation and is relevant to the task at hand." *Bustamante*, 100 F.4th at 427 (quoting *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 597 (1993); *see Mirena II,* 982 F.3d at 123.

To be relevant, an expert's opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591. This is sometimes known as requiring an expert's opinion to "fit" the facts of the case. *Daubert*, 509 U.S. at 591-592; *see Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 49 (E.D.N.Y. 1999). Where an expert provides testimony that "does not relate to any issue in the case," or assumes facts for which there is no evidentiary basis, the opinion "is not relevant and, ergo, non-helpful" and must be excluded. *Daubert*, 509 U.S. at 591; *Donnelly,* 80 F. Supp. 2d at 50-51; *see Sardis,* 10 F.4th at 288-89 (where expert testified that standard was relevant benchmark for analyzing product design, but conceded standard was not applicable to product at issue, district court committed legal error by not excluding testimony as irrelevant under Rule 702).

23

Relevance does not end the Rule 702 inquiry. "[I]t is critical that an expert's analysis [also] be reliable at every step," and "*any* step that renders the analysis unreliable ... *renders the expert's testimony inadmissible*." *Amorgianos*, 303 F. 3d at 267 (emphasis in original, quotation omitted); *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 335 (S.D.N.Y. 2023) (quoting *Amorgianos*, 303 F. 3d at 367).

"[I]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a *rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *In re Acetaminophen*, 707 F. Supp. 3d at 335 (quoting *Mirena II*, 341 F. Supp. 3d at 240). Where an expert fails to substantiate his or her opinions with testing or data or fails to account for relevant evidence, the opinion is unreliable and must be excluded. *See In re Acetaminophen*, 707 F. Supp. 3d at 336 ("exclusion of the proffered testimony is warranted where the expert fails to address evidence that is highly relevant to his or her conclusion.") (citation omitted); *Sardis*, 10 F. 4th at 295 (where expert failed to validate his theory with testing or other objective comparison, he "presented a hypothesis only" and his opinions were unreliable).

### B. Summary Judgment

Summary judgment is appropriate when the evidence establishes that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), 56(c)(1). When the burden of proof at trial would fall on the nonmoving party, the movant need only point to an absence of evidence to support an essential element of the non-moving party's claims. *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *Bustamante*, 100 F.4th at 432.

New York law requires "competent, non-conclusory expert testimony" to establish causation "in virtually every product liability case where the alleged defect is not obvious," including cases involving complex machinery or equipment like the one at bar. *Martins*, 2024 WL 694082, at \*1, \*3; *see also, e.g., Jinn*, 2023 WL 5972507, at \*17. And "[e]xpert testimony that amounts to no more than say-so is insufficient to defeat summary judgment." *Mirena I,* 202 F. Supp. 3d at 327 (granting summary judgment after excluding general causation experts).

Where product liability plaintiffs fail to proffer admissible expert testimony on causation, "motions for summary judgment must be and are granted." *In re Gen. Motors LLC Ignition Switch Litig.,* No. 14-CV-5810 (JMF), 2017 WL 6729295, at \*11 (S.D.N.Y. Dec. 28, 2017); *see Mirena I,* 202 F. Supp. 3d at 327.

### III. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN CONCLUDING THAT THE COLWELLS FAILED TO MEET THEIR BURDEN TO ESTABLISH THE ADMISSIBILITY OF THEIR EXPERTS' TESTIMONY UNDER RULE 702.

To meet Rule 702's requirements for admissibility of expert testimony, the Colwells were required to establish that their experts provided testimony that (1) would help the finder of fact to answer a question relevant to a finding in favor of the plaintiff ("fit"), and (2) was based on sufficient facts and was the product of reliable principles and methods that were reliably applied to the facts of the case. They failed on both counts.

### A. The Colwells' Expert Testimony Does Not Meet the Rule 702 Fit Requirement Because New York Law Does Not Permit a Design Defect Claim When a Purchaser Declines an Optional Safety Device.

The district court properly exercised its discretion in excluding Vigilante's and Tertin's opinions because they do not "fit" the law and facts of this case, and therefore do not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). As the district court recognized, Sig Sauer offered a version of the P320 with a manual safety, but the Troy Police Department decided to buy a model without one. *See* A397, District Ct. Op. at 12 n.4. New York law is clear that where, as here, a manufacturer offers an optional safety device and a purchaser elects not to purchase it, plaintiffs cannot sustain a design defect claim. *See Pahuta*, 170 F.3d at 133; *see Sardis,* 10 F.4th at 294 (expert's testimony

26

pertaining to legal standard that was incompatible with governing law should have been excluded as irrelevant).

In explaining its rationale, New York courts hold that when a manufacturer offers optional safety equipment, the burden to assess risk and decide whether to purchase the safety equipment falls to the purchaser – here, the Troy Police Department:

> [A]ccording to this theory, the manufacturer cannot meaningfully assess the risk of selling the product without the safety feature prior to sale because it does not know the use to which the product later will be put. It is the purchaser, not the seller, 'who is in the best position to make the cost-benefit analysis and act upon it.'

*Pahuta*, 170 F. 3d at 133 (quoting Guido Calabresi & Jon T. Hirschoff, *Toward a Test for Strict Liability in Torts,* 81 Yale L.J. 1055, 1063 (1972)).

This optional equipment doctrine in New York dates back to *Biss v. Tenneco Inc.*, 64 A.D.2d 204 (N.Y. App. Div. 1978). In *Biss*, plaintiff's decedent was operating a loader used in his logging business when it tipped over and hit a telephone pole. *Id*. at 205. Plaintiff alleged design defect because the loader was not manufactured with a rollover protection structure as a standard feature. *Id*. at 206. The court affirmed dismissal because "defendants had fulfilled their duty to exercise reasonable skill and care in designing the product as a matter of law when they advised the purchaser that an appropriate safety structure for the loader was

27

available." *Id*. at 207. Indeed, "it is the purchaser who best can make the decision and he should bear the loss which results from his failure to do so." *Id*. at 208.

The New York Court of Appeals subsequently applied the *Biss* analysis to a case in which a school bus company elected to purchase its buses without an alarm to sound when the driver drove the bus in reverse. *Scarangella v. Thomas Built Buses, Inc.*, 93 N.Y.2d 655 (1999). In rejecting the plaintiffs' product liability claims, the court "distilled[ed] governing principles" that are equally applicable here:

> The product is not defective where the evidence and reasonable inferences therefrom show that: (1) the buyer is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and (3) the buyer is in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of *the buyer's* use of the product.

*Id*. at 661 (emphasis in original). New York courts routinely uphold this doctrine. *See Geddes v. Crown Equip. Corp.*, 273 A.D.2d 904, 904-05 (N.Y. App. Div. 2000) (forklift offered with optional backup alarm not defectively designed); *Jackson v. Bomag GmbH*, 225 A.D.2d 879, 882-83 (N.Y. App. Div. 1996) (road construction static roller offered with optional rollover protection not defectively designed); *Rainbow v. Albert Elia Bldg. Co.,* 79 A.D.2d 287, 290-91 (N.Y. App. Div. 1981) (affirming judgment on other grounds but "noting" that a motorcycle was not

28

unreasonably dangerous when the manufacturer offered crash bars as optional equipment and the owner removed them).

There is no dispute that the Troy Police Department made the conscious decision to purchase P320s for its police officers without a manual safety because it deemed that type of firearm best for the needs of its officers. Sig Sauer's decision to offer its customers the option whether or not to purchase P320s with a manual safety does not, under New York law, render the handgun defective. As Sig Sauer's expert explained, "[t]he subject SIG Sauer P320 pistol is not defective because it is tailored for customers whose philosophy of use excludes manual safeties." SA032, Watkins Report at 29.

Further, New York courts consider a purchaser's overall experience and familiarity with the market when applying this optional equipment doctrine. *See Scarangella*, 93 N.Y.2d at 661 ("[Plaintiff's employer]…had owned and operated school buses serving a number of school districts for decades and certainly were aware that a bus driver had a blind spot… [and,] when it purchased the bus…knew that the back-up alarm was available."); *Geddes*, 273 A.D.2d at 904 ("Defendants established that employer was aware of availability of such warning alarms and had purchased other forklift trucks without them"); *Elia Bldg. Co.*, 79 A.D.2d at 291 (purchaser was an "experienced motorcyclist" and former racer who testified "that he was familiar with crash bars…and that in fact he had removed crash bars

[from]…a previously owned motorcycle, finding them dangerous for his needs"). As a sophisticated purchaser, the Troy Police Department not only made the decision to purchase the P320 model without a manual thumb safety, it chose that Sig Sauer model over other options from across the market – including handguns equipped with a tabbed trigger safety. Under these facts, the Colwells cannot prove their case based on an expert theory that the lack of an external safety rendered Mr. Colwell's P320 pistol defective.

Because the Colwells' expert opinions do not support a recognized theory of liability under New York law, they "do[] not relate to any issue in the case" and are "not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. They fail the "fit" test and were properly excluded.

### B. The Colwells Have Not Shown That Their Experts' Testimony Satisfies The Rule 702 Reliability Requirements.

Under New York law, product liability plaintiffs "must offer admissible expert testimony regarding both general causation … and specific causation" as part of their *prima facie* case. *Amorgianos,* 303 F.3d at 268; *Mirena I,* 202 F. Supp. 3d at 309; *Glowczenski v. Taser Int'l, Inc.,* 928 F. Supp. 2d 564, 581 (E.D.N.Y. 2013), *aff'd in part, dismissed in part,* 594 F. App'x 723 (2d Cir. 2014). To establish general causation, plaintiffs must show that a product defect is capable of causing the injury alleged, while specific causation requires proof that "in th[is] particular instance, the

30

injury actually was caused or exacerbated by the defendant's product." *Glowczenski*, 928 F. Supp. 2d at 581; *see Mirena II*, 982 F.3d at 125.

The district court acted well within its discretion in concluding that the Colwells' experts failed to provide reliable testimony in support of either type of causation.

### 1. Dr. Vigilante's and Mr. Tertin's general causation opinions are not grounded in sufficient facts and are unreliable.

The Colwells' experts characterize the discharge of Mr. Colwells' gun after its trigger was pulled as evidence of a defect.[7] But as they acknowledge, all handguns can accidentally discharge when the trigger is pulled – including those equipped with tabbed triggers. *See, e.g.,* A118, Vigilante Report at 11 ("The unintentional discharge of a firearm is a known risk associated with the use of handguns."); A423-424, Tertin Dep., *Colwell*, at 20:4-10, 22:2-5; SA002-003, Vigilante Dep., *Northrop*, at 42:14-43:1. The fact that a handgun will discharge when the trigger is pulled is not a defect; it is the intended and expected characteristic of a gun. Indeed, simple

---

[7] The Colwells' contention that Sig Sauer did not challenge their experts' general causation opinions in the district court is without basis. *See* Appellant Br. at 62; *see also* A220-222, Mem. in Supp. of Sig Sauer Mot. for Summ. J. at 7-9 (challenging Vigilante's opinion that the P320 is "uniquely dangerous" noting his failure to compare accidental discharge rates of other handguns); A272-274, Mem. in Supp. of Sig Sauer Mot. to Exclude Tertin at 3-5 (challenging Tertin's defective design opinion based on lack of tabbed trigger); A402-403, District Ct. Op. at 17-18.

Google searches yield numerous results for accidental discharges involving Glock and Smith & Wesson pistols equipped with tabbed trigger safeties. *See* A220-221, Mem. in Supp. of Def. Sig Sauer, Inc.'s Mot. for Summ. J., at 7-8.

The accidental discharge itself, therefore, does not establish that P320s are any less safe than competitor pistols. To establish general causation for a claim of product defect here, the Colwells need to establish that P320 pistols – when handled appropriately – are *more likely* than pistols equipped with tabbed triggers to accidentally discharge when their triggers are pulled. The Colwells' experts have no such evidence.

While both experts contend that the P320 experiences a higher incidence of accidental discharges than pistols equipped with tabbed triggers, neither provides any factual basis for this opinion. *See* A422, Tertin Dep., *Colwell*, at 15:1-13; A205, Tertin Report at 17; A118-123, Vigilante Report at 11-16. Neither Vigilante nor Tertin proffers any information about the incidence rate of accidental discharges for pistols equipped with tabbed trigger safeties to support this opinion. *See* A425, Tertin Dep., *Colwell*, at 25:17-22; A553-554, Vigilante Dep., *Slatowski,* at 124:21-125:7, 126:3-127:23, 128:14-18.

Instead, Vigilante points only to "anecdotal data" derived from searching YouTube for videos of accidental discharges, and a single, partially redacted memorandum from ICE. A553-554, Vigilante Dep., *Slatowski,* at 124:21-125:7,

32

126:7-23. But such "anecdotal data" cannot support a conclusion that any of the P320's design features caused the accidental discharges, or that the rate of such discharges is higher among P320s than other pistols. *See, e.g., Mirena I,* 202 F. Supp. 3d at 325 ("[c]ase reports are not reliable evidence of causation," collecting cases noting such "anecdotal" information does not appropriately rule out other potential causes of the alleged injury); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on anecdotal evidence…").

In *Jinn v. Sig Sauer,* another New York federal court excluded an expert's opinions that relied, in part, on videos allegedly depicting other accidental discharge incidents involving a P320. The court found the videos did not "allow a viewer to discern whether the pistols in the videos had the same 'defects' as in [plaintiff's], if those 'defects' caused the discharges, or if the pistols were in the same condition and working order." *Jinn v. Sig Sauer,* No. 20CV1122PGG RWL, 2023 WL 2919558, at *10 (S.D.N.Y. Apr. 12, 2023), *rep. and rec. adopted sub nom.*, *Jinn v. Sig Sauer Inc.*, No. 20CIV1122PGGRWL, 2023 WL 5972507 (S.D.N.Y. Sept. 13, 2023). The court held that "[t]he leap from the unauthenticated videos . . . to [expert's] conclusions that [plaintiff's] P320 was defective and that those defects caused his accident in particular, is too far for this Court to find [expert's opinions] reliable." *Jinn*, 2023 WL 2919558, at *10. The same is true for the videos Vigilante cites.

Aside from these anecdotal videos, Vigilante points to the ICE memorandum discussing a series of accidental discharges in P320s and other unidentified handguns. A553-554, Vigilante Dep., *Slatowski,* at 124:21-125:7, 126:3-127:12, 128:14-18. But as noted above, this memo does not provide data that would be necessary to evaluate the relative rates of accidental discharges among P320s or other handguns. A554-555, Vigilante Dep., *Slatowski,* at 128:14-129:12; *see* Statement of the Case Section III(A), *supra*. Vigilante's speculative leap based on such anecdotal data to reach a conclusion about the relative rate of unintended discharges amongst different pistols does not "stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *See* 2023 Notes.

Tertin's general causation opinion is similarly bereft of factual underpinnings. He conducted no research into real-world data on the relative rate of accidental discharges of the P320 compared to competitor pistols to support his opinion. *See* A425, Tertin Dep., *Colwell*, at 25:11-22; *see also* A423, Tertin Dep., *Colwell*, at 17:4-24, 41:15-44:21 (testifying he conducted no additional research after being informed about numerous reports of unintended discharges involving Glock pistols, including a Washington Post article reporting more than 120 accidental discharges he was shown in a deposition). And as the district court noted, Tertin made clear that "he would not change his opinion about this matter, even if it were proven that pistols

with tabbed triggers discharged unintentionally three times as often as the P320." A397, District Ct. Op. at 12; A424, Tertin Dep., *Colwell,* at 23:7-24:6. Blindly holding to an opinion even in the face of contradictory evidence is not the mark of reliable expert opinion. *See also In re Acetaminophen*, 707 F. Supp. 3d at 353-54 (expert's dismissal of evidence that challenged his theory was "result-driven analysis" that rendered opinion unreliable).

Furthermore, the Colwells cannot establish general causation based on the P320's lack of a tabbed trigger because both of their experts admit that a tabbed trigger would not prevent a pistol from discharging when the trigger is pulled, as occurred here. See A420, 423-425, Tertin Dep., *Colwell*, at 7:4-10, 20:4-10 (stating intentional trigger pull disengages tabbed trigger), 22:2-5 (tabbed trigger can be pulled and discharge gun without user intending to do so), 27:5-9; SA002-003, Vigilante Dep., *Northrop*, at 42:14-43:1; *see also* A493, Tertin Dep., *Herman*, at 98:16-22 (tabbed trigger does not do enough to render gun safe from unintentional discharges). While Tertin seeks to differentiate P320s by opining as to the pounds of force required to disengage the handgun's internal safeties, he provides no reliable basis to conclude that the same pounds of force would not disengage a tabbed trigger, nor does he provide any evidence as to the pounds of trigger force that were applied to Mr. Colwell's P320 at the time it discharged. *See* Statement of the Case Section III(A), *supra*. The Colwell's experts also do not account for the fact that the P320 is

equipped with a balanced trigger mechanism that obviates the need for a tabbed trigger. *See* Statement of the Case Section I, *supra.*

The Colwells' experts likewise cannot reliably point to the lack of a manual thumb safety to establish general causation here, because there is nothing in the record to suggest that such a safety would be engaged during the police training exercises in which Mr. Colwell's accident occurred – particularly given the fact that the training was being conducted by the Troy Police Department to guide its officers on the use of handguns that intentionally were not equipped with a manual safety. *See* Statement of the Case Section II, *supra.*

Without any reliable facts underlying their opinions, both experts' general causation opinions are "based on data, a methodology, or studies that are simply inadequate to support the[ir] conclusion[.]" *See Amorgianos,* 303 F.3d at 266. Because they have asked the court to simply "tak[e] the expert's word for it," the district court did not abuse its discretion in excluding their opinions. Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

## 2. Dr. Vigilante's and Mr. Tertin's specific causation opinions are not grounded in sufficient facts and are unreliable.

The Colwells separately fail to meet their Rule 702 burden of establishing the admissibility of their experts' testimony on specific causation. To establish specific causation, the Colwells must proffer appropriately supported and reliable expert

testimony explaining what pulled Mr. Colwell's trigger, and how the handgun would have responded to such action with or without a tabbed trigger. *See Martins*, 2024 WL 641383, at *1; *Guarascio,* 582 F. Supp. 2d at 463-64. Without identifying what pulled the trigger and how, there is no basis for any opinion that a tabbed trigger would have prevented the discharge here.

Remarkably, both of the Colwells' experts concede that they do not know what pulled his P320's trigger, and they conducted no investigation to rule out potential alternative causes. A420, A425, Tertin Dep., *Colwell*, at 7:4-22, 27:5-9; A503-505, Vigilante Dep., *Colwell*, at 19:20-24:1, 28:6-14. Despite asserting that a trigger pull from the side could have caused a discharge, they also concede that they do not know where the trigger was contacted. *See* A503-506, Vigilante Dep., *Colwell*, at 20:13-22:19, 28:19-29:6; SA003-004, Vigilante Dep., *Northrop*, at 42:14-43:22; A121, Vigilante Report at 10; A420, Tertin Dep., *Colwell*, at 7:14-17; A202-203, Tertin Report at 14-15.

### a. Dr. Vigilante failed to conduct any case-specific investigation and does not exclude alternative causes of Mr. Colwell's accident.

Vigilante testified that he reached his specific causation opinion based on Mr. Colwell's deposition testimony and the Troy Police Department record's accounts of how Mr. Colwell's discharge occurred. *See* A503, Vigilante Dep., *Colwell,* at 18:7-19. But as discussed above, the competing accounts of the accident set forth in

those sources allow for a number of alternative causes of the discharge that are contrary to Vigilante's opinion. *See* Statement of the Case Section III(B), *supra*. Vigilante fails to provide any reasoned basis to exclude the possibility that the P320 discharged while it was being "manipulated" by Mr. Colwell (as the police department investigation concluded) or as Mr. Colwell was attempting to return the gun to its holster (as set forth in the EMS report). *See In re Terrorist Attacks on Sept. 11, 2001*, 2024 WL 5077293, at *11, *27 (finding expert's "selective reliance on evidence, especially when it lines up with the outcome desired by the party who retained him," suggested impermissible "cherry-picking" that would render opinion unreliable). Indeed, Vigilante conceded that "certainly it's possible" that something could have gotten in the way of the trigger when Mr. Colwell was holstering the gun. A504, Vigilante Dep., *Colwell,* at 22:13-19. And even crediting Mr. Colwell's contrary testimony, Vigilante conducted no investigation into what other force (which Vigilante admits must have been present) depressed the trigger or whether a tabbed trigger would have made any difference in the face of this unknown force.

Notably, Vigilante did not take any of the obvious steps that one would expect an expert to take to try to answer these questions. "He did not personally inspect the holster or the pistol" at issue. A392-393, District Ct. Op. at 7-8. Nor did he speak with Mr. Colwell or anyone with direct knowledge of the incident (A502, Vigilante Dep., *Colwell*, at 13:14-20), or otherwise attempt to reconcile the conflicting

38

accounts of how the incident occurred. A503, Vigilante Dep., *Colwell,* at 17:8-21; A393, District Ct. Op. at 8; A109, Vigilante Report at 2; *see Jinn*, 2023 WL 2919558, at *11 (excluding expert's opinions, in part, because expert did not speak with plaintiff or any witnesses, review any materials or reports, or inspect the pistol or holster at issue).

Ultimately, Vigilante concedes that any number of different events could have caused Mr. Colwell's P320 to discharge. A504-505, Vigilante Dep., *Colwell,* at 23:2-8 ("certainly it's possible for a trigger to be inadvertently pulled by a button or a zipper from an article of clothing being caught in the holster"), 28:6-14 (does not know what touched the trigger, whether it was inertial, finger, foreign object, or other). Vigilante's failure to rule out these other possible causes of Mr. Colwell's accident renders his specific causation opinion unreliable. *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 2024 WL 5077293, at *10 (quoting *Joiner*, 522 U.S. at 146) (expert's failure to account for reasonable alternative explanations exposes the "analytical gap[s] between" the facts and her opinions); *Deutsch v. Novartis Pharmaceutical Corp.*, 768 F. Supp. 2d 420, 474 (E.D.N.Y. 2011) (quoting *Israel v. Spring. Indus., Inc.*, 98-CV-5106, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006) ("'the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant.'"); *Mancuso v. Consol. Edison Co. of N. Y., Inc.,* 967 F. Supp.

1437 (S.D.N.Y. 1997) ("Critical to establishing specific causation is exclusion of other possible causes…") (citation omitted).

Vigilante's general background in, or knowledge about, firearms also cannot save his specific causation opinions here. A392, District Ct. Op. at 7; *see* A509, Vigilante Dep., *Colwell,* at 42:18-44:1. Reliance on such knowledge or experience requires that Vigilante "say more than that his opinion rests on his particular experiences." *Auto. Ins. Co. of Hartford v. Electrolux Home Prods., Inc.,* No. 08-CV-00623(A)(M), 2010 WL 3655743, at *7 (W.D.N.Y. Sept. 15, 2010). He must "show how he has brought [that experience] to bear on the matter at hand" and "provid[e] at least some comparable data that provides him with a basis for reaching the conclusion that he plans to offer." *Id.* (precluding expert from opining on specific causation based on his experience inspecting other dryers because he failed to explain how it supported his causation opinion regarding plaintiff's particular dryer); *see In re Terrorist Attacks on Sept. 11, 2001,* 2024 WL 5077293, at *17 (excluding expert testimony as unreliable, in part due to "[t]he absence of a clear connection between [his] experience and opinions"). That Vigilante has failed to make the required connection here further requires exclusion of his specific causation opinions.

40

###### b. Mr. Tertin's specific causation opinion relies solely on general conclusions and speculation unrelated to the facts surrounding Mr. Colwell's accident.

Tertin's specific causation opinions fare no better, as they are likewise devoid of a reliable factual basis or investigation into the facts of Mr. Colwell's accidental discharge.

Tertin claims he reviewed plaintiff's deposition testimony, "scanned" the Troy Police Department report, and inspected Mr. Colwell's pistol to gain information about how Mr. Colwell's discharge occurred. A421, Tertin Dep., *Colwell*, at 10:13-24; A398, District Ct. Op. at 13. But as with Vigilante, Tertin's sources of information present contradictory accounts of what occurred, and he made no attempt to investigate the facts of this case to reconcile these conflicting accounts or otherwise inform his opinion. He admits he did not review any file materials (A420, Tertin Dep., *Colwell*, at 5:3-14); did not inspect Mr. Colwell's holster (A421, *Id*. at 11:5-9); and does not know what clothing Mr. Colwell was wearing (A423, *Id*. at 17:1-3). He is unaware of whether Mr. Colwell's hands were on or off of the pistol when it discharged. A421, *Id*. at 11:11-15. He does not know the amount of force applied to cause the unintentional discharge under the circumstances of this case. A420, *Id*. at 7:18-22. Nor does he know where Mr. Colwell's trigger was contacted to cause the discharge. *Id*. at 7:14-17. His "inspection" of Mr. Colwell's pistol somehow answered none of these questions.

41

Tertin seeks to paper over these fatal flaws in his analysis by opining about the "practical function" of a tabbed trigger and the general conclusions that adding a tabbed trigger is just "one more step for safety." A423, A425, Tertin Dep., *Colwell*, at 18:2-25, 25:24-26:7. But Tertin fails to conduct any case-specific testing to connect his general opinions regarding tabbed triggers to the facts in this case. Notably absent is any testing or analysis that even purports to (1) identify the alternative factors that could have pressed down on the trigger of Mr. Colwell's P320 pistol, (2) determine the amount of force that each alternative factor would have placed on the trigger, and (3) analyze whether a tabbed trigger would have prevented the discharge. *See In re Gen. Motors LLC Ignition Switch Litig.,* 2017 WL 6729295, at *8 (excluding expert causation opinion, in part, because it was based simply on "logical deduction" rather than testing or evidence relating to the facts of the incidents at issue); *In re Terrorist Attacks on Sept. 11, 2001,* 2024 WL 5077293, at *21.

Tertin's opinion that a manual thumb safety would have prevented Mr. Colwell's discharge is likewise devoid of sufficient facts in support. Unlike a tabbed trigger safety, a manual thumb safety must be "consciously engaged" and requires the user's "deliberate manual manipulation" to engage and prevent the pistol from firing. SA027, Watkins Report at 24. Here, Mr. Colwell's pistol discharged as he was moving through police training exercises that were designed for the use of police

42

department selected handguns that were intentionally not equipped with thumb safeties. In opining that a manual thumb safety would have prevented Mr. Colwell's pistol from discharging, Tertin thus must speculate Mr. Colwell would have been allowed to use an unapproved handgun during this training and that he would have then deliberately engaged the thumb safety during those exercises.

Mr. Tertin admits he has no information to support this speculation. A422, Tertin Dep., *Colwell*, at 15:9-13, 15:18-16:6. To the contrary, the district court found that there is nothing in the record to establish that Mr. Colwell would have engaged a manual thumb safety and noted the evidence is to the contrary. A397, District Ct. Op. at 12 ("Mr. Colwell personally owns a pistol without a manual safety."); *see also* A035, M. Colwell Dep. at 49:11-12, A026, 14:16-20, 15:23-16:16 (all indicating the service weapon he had been using since 2009 had no external safety). "Without any evidence permitting an inference that a thumb safety would have been used, a finding that the lack of a thumb safety caused the accident is pure speculation" and was properly excluded. A397, District Ct. Op. at 12 (internal citation and quotation omitted).

43

### c. The District Court did not abuse its discretion in concluding that Mr. Colwells' experts' failure to conduct fact-specific testing rendered their specific causation opinions unreliable.

Neither of the Colwells' experts conducted any testing to approximate the conditions present during the police training exercises when Mr. Colwell's pistol was discharged. As the district court noted, Vigilante did not "conduct any formal testing" at all to attempt to verify how the discharge occurred in this specific case. A392, District Ct. Op. at 7. He conducted no testing to determine whether a round is able to eject from a P320 while fully holstered in the Cytac holster Mr. Colwell was using, or to otherwise verify whether the physical evidence was consistent with Mr. Colwell's account of the incident. *See* A501, Vigilante Dep., *Colwell,* at 11:11-21. He also did not investigate where the trigger was contacted to cause the discharge. A503-504, Vigilante Dep., *Colwell,* at 20:19-21:23; *see Sardis,* 10 F. 4th at 291 (finding expert causation opinion unreliable because "[w]ithout such testing, [expert] could not competently respond to several questions that required answers in order to reliably arrive at his ultimate proximate causation opinions"); *see also* Fed. Ref. Manual of Scientific Evid., Ref. Guide on Eng'g, at 935 (3d ed. 2011) ("Engineers can design tests to study kinematics (motions) and kinetics (forces) and to recreate accidents; to evaluate physical, mechanical, and chemical properties of materials; or to assess specific characteristics against claims in a patent. Because the

circumstances surrounding accident and product failure investigation can be quite complex, and often novel as well, engineers sometimes must design experiments that have never before been performed.").

The only testing conducted by Colwells' experts was so divorced from the facts of Mr. Colwell's discharge that it cannot provide any reliable basis for a specific causation opinion. Securing pistols in clamps to render them immovable, under controlled conditions in which specific portions of the trigger were carefully and deliberately pressed, does not come close to replicating the conditions of Mr. Colwell reaching "across [his] body" while moving through training drills when his pistol discharged. A037, A039, M. Colwell Dep. at 57:8-18, 66:5-67:10; *see* Appellant Br. at 21-23 (discussing Vigilante's testing firearms with tabbed triggers), 30-32 (discussing Tertin's testing firearms with tabbed triggers); *see also, e.g., In re Gen. Motors LLC Ignition Switch Litig.,* 2017 WL 6729295, at *7 (excluding opinions of experts whose testing did not "try to replicate the conditions" of the accident and could not "point to any experiments they have done—let alone tests, opinions, studies, data, or reports in the scientific literature writ large—that would tend to show that the [alleged defect] is anything more than a working hypothesis regarding the cause of Plaintiffs' accidents"); *Automobile Ins. Co. of Hartford*, 2010 WL 3655743, at *6 (precluding expert from testifying as to specific causation, in part because his testing made no attempt to mimic the conditions of incident at issue).

The Colwells seek to avoid these consequences of their experts' inadequate testing by arguing that the experts' failure to conduct incident-specific testing bears on the weight, and not admissibility, of their opinions. Appellant Br. at 52-53. Not so. As noted *supra*, this is precisely the "incorrect application" of Rule 702 that the 2023 Amendments were enacted to address. *See* 2023 Notes. ("many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)."); *see also Mirena II*, 982 F.3d at 123 ("not only was it appropriate for the district court to take a hard look at plaintiffs' experts' reports, the court was required to do so to ensure reliability.").

\*　　\*　　\*

The district court acted well within its discretion in concluding that Vigilante and Tertin offered opinions that are not "based on sufficient facts or data," are not "the product of reliable principles and methods," and do not "reflect[ ] a reliable application of the principles and methods to the facts of the case." A393, District Ct. Op. at 8; A398, District Ct. Op. at 13. The district court's exclusion of those experts' opinions should be affirmed.

46

## IV. WITHOUT THE TYPE OF ADMISSIBLE EXPERT CAUSATION TESTIMONY REQUIRED UNDER NEW YORK LAW, THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT FOR SIG SAUER.

In the absence of admissible expert testimony to establish causation, the district court properly granted summary judgment for Sig Sauer. To challenge this ruling, the Colwells first assume that their experts' general causation opinions are admissible and then argue that expert testimony is not required to establish specific causation. As discussed in Argument Section III(B)(1), *supra,* the first step in the Colwells' argument is not met because Vigilante's and Tertin's general causation opinions do not pass muster under Rule 702's relevance and reliability requirements. As to specific causation, the Colwells' argument that expert testimony is not required fails as a matter of law.

### A. New York Law Requires Expert Testimony To Establish Causation In This Complex Design Defect Case.

New York law requires "competent, non-conclusory expert testimony" to establish causation "in virtually every product liability case where the alleged defect is not obvious." *Martins,* 2024 WL 694082, at *1, *3; *Guarascio,* 582 F. Supp. 2d at 463-64. New York courts routinely uphold this requirement in cases involving complex machinery and equipment like the P320 firearm at issue. "[F]irearms are not the type of product for which alternative designs are obvious and understandable; cases involving less technically complex products have failed for lack of expert

47

testimony on feasible alternative designs." *Jinn*, 2023 WL 2919558, at *17 (quotation omitted).

As such, New York courts repeatedly grant summary judgment in cases like this where plaintiffs fail to present expert testimony to support their specific causation claims. *See Jinn*, 2023 WL 5972507, at *17 (granting summary judgment because without expert testimony "identifying defects and asserting causation" there is "no evidence that any design defect caused Jinn's accident.") (internal citation and quotations omitted); *see also, e.g., Barrett v. Black & Decker (U.S.) Inc.,* No. 06 CIV. 1970(SCR)MDF, 2008 WL 5170200, at *9 n.8 (S.D.N.Y. Dec. 9, 2008) ("where, as here, no witness can establish causation (including Plaintiff…) . . . expert testimony is necessary to show how a defect in the subject table saw caused Plaintiff's injury." (citation omitted)); *Martins*, 2024 WL 694082, at *1 (granting summary judgment after excluding plaintiff's expert because expert testimony was required to establish causation where aerosol paint can exploded and injured plaintiff); *Pierre v. Hilton Rose Hall Resort & SPA,* No. 14 CIV. 3790 (VMS), 2016 WL 4742281, at *5 (E.D.N.Y. Sept. 12, 2016) (dismissing defective design claim because "a lay person would neither readily understand nor necessarily find obvious the nature of pool and/or waterslide design" which "requires specialized and technical knowledge" pertaining to the angle of the waterslide, effects of friction in relation to riders' speed and weight, and other issues).

48

### B. The Specific Causation Analysis In This Case is Highly Technical and Requires Expert Testimony.

In this case, the specific causation inquiry involves complex issues of mechanics, engineering, and physics that require expert testimony. The Colwells' experts both concede that something pulled the trigger on Mr. Colwell's pistol. The specific causation inquiry thus focuses on whether whatever pulled the trigger would not have resulted in a discharge if the P320 was equipped with an external safety.

While it is certainly the case that a manual thumb safety, *if engaged*, would have prevented Mr. Colwell's P320 from discharging, neither of the Colwells' experts offer any meaningful opinion that the lack of such a safety device in this case is a design defect that caused Mr. Colwell's injury. As discussed above, any such opinion would be contrary to New York law regarding optional equipment and wholly disconnected from the facts in this case, where the Troy Police Department intentionally issued Mr. Colwell and all of its officers P320s that were not equipped with this optional safety device, and Mr. Colwell's accident occurred during police training. *See* Statement of the Case Section II, Argument Section III(A), *supra*.

The specific causation question, then, is whether a tabbed trigger would have prevented Mr. Colwell's accident. The first step in this inquiry is to determine whether tabbed triggers are even intended to prevent discharges caused by accidental trigger pulls. As Sig Sauer's expert, Mr. Watkins, explained, the answer to that

trigger pulls. As Sig Sauer's expert, Mr. Watkins, explained, the answer to that question is no. Tabbed triggers instead are provided with certain handguns (with unbalanced trigger mechanisms) to address a wholly separate concern relating to dropped gun discharges. SA028-030, Watkins Report at 25-27. Indeed, the Colwells' experts concede that a tabbed trigger will not prevent a gun from discharging if the trigger is depressed. A423-424, Tertin Dep., *Colwell* at 20:4-10, 22:2-5; SA002-003, Vigilante Dep., *Northrop*, at 42:14-43:1.

The next crucial step in the specific causation inquiry is the extent to which, if any, a tabbed trigger would have required more force to depress the trigger and, if so, whether the incremental difference in necessary trigger pull force was the cause of the discharge in this case. This question cannot be answered without (1) expert testimony regarding the necessary trigger pull force to discharge handguns equipped and not equipped with tabbed triggers, (2) an expert investigation into the alternative causes that may have pushed down on the trigger on Mr. Colwell's P320 pistol during the police training exercise, and (3) an expert analysis of the pounds of force that would have been applied on the trigger by each of these alternative causes.

The Colwells' expert, Mr. Tertin, bases his opinion that the lack of a tabbed trigger caused Mr. Colwell's injury on general testing that he states showed that the internal safeties on a P320 pistol can be disengaged with 1.5 pounds of force. A199-200, A207, Tertin Report at 11-12, 19; A421-422, Tertin Dep., *Colwell*, at 11:17-

50

15:8. Sig Sauer's expert presents evidence that squarely rebuts this argument by showing that tabbed triggers likewise are disengaged with less than 1.5 pounds of force. SA021, Watkins Report at 18. Moreover, Mr. Watkins conducted extensive testing *of the specific P320 pistol at issue here*, which found that the gun never discharged without a trigger pull that exceeded 6.25 pounds of force. SA020, *Id*. at 17.

Absent expert testimony, a lay jury does not have the experience or expertise to even understand what actions would result in 1.5 pounds or 6.25 pounds of trigger force. And absent expert testimony investigating and then addressing each of the alternative causes of the trigger pull in this case, a lay jury would have no way of determining whether any purported difference in the required force of a trigger pull in a gun equipped with a tabbed trigger would have prevented a discharge in connection with any one of those alternative causes.

Disregarding the complexity of the specific causation inquiry in this case, the Colwells instead rely on the few "limited circumstances"[8] in which expert testimony was not required because the case involved a product with an obvious design far simpler than that of a firearm. These cases do not support the Colwells' argument here.

---

[8] *Pierre*, 2016 WL 4742281, at *5.

In *Castaldi v. Land Rover N. Am., Inc.*, No.06-CV-1008JGKAM, 2007 WL 4165283, at *11 (E.D.N.Y. Nov. 21, 2007), for example, the court found expert testimony was not required to show that car brake systems "generally work to prevent vehicles from switching from park to drive unless the brake is engaged" – an obvious fact readily intelligible to a lay juror. Likewise in *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 110–11 (1983), the exposed portion of a table saw blade descended on plaintiff's hand and severed part of his thumb. The district court here properly distinguished *Voss* from the case at bar: whereas what happened to cause the injury in *Voss* was known and undisputed, here "there is no clear description of what caused the P320 to discharge and how the accident happened. And the mechanics of a P320 firearm are not within the common knowledge of a lay person." A401, District Ct. Op. at 16. And as the district court pointed out, plaintiffs in *Voss* were only allowed to proceed because they had excluded all potential alternative causes of the accident attributable to the defendant – which the Colwells admit they have not done here. A402, District Ct. Op. at 17 (citing *Speller ex rel. Miller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 41 (2003)).

The Colwells' reliance on *Davis v. Sig Sauer, Inc.* is also unavailing. *Davis* was decided under Kentucky law, which – in sharp contrast to New York law – the

Sixth Circuit concluded "do[es] not require expert evidence to prove causation—at least outside of a medical-malpractice claim." 126 F.4th 1213, 1232 (6th Cir. 2025).[9]

New York law requires the Colwells to proffer admissible expert causation testimony to proceed on their design defect claims against Sig Sauer. They failed to do so, and the district court thus properly granted summary judgment. *See, e.g., Mirena I,* 202 F. Supp. 3d at 327–28 (granting summary judgment after excluding plaintiffs' experts on general causation).

## V. THE DISTRICT COURT PROPERLY CONSIDERED ALL OF THE FACTS AND ARGUMENTS ENCOMPASSED BY THE COLWELLS' RESPONSE TO SIG SAUER'S STATEMENT OF UNDISPUTED MATERIAL FACTS.

Finally, the Colwells' contention that they were prejudiced because a footnote in the district court's opinion suggests that it did not review their Response to Defendant's Statement of Undisputed Material Facts is a red herring which does not come close to constituting reversible error. *See* Appellant Br. at 43-44. Even if the district court did not separately consider the Colwells' responses to Sig Sauer's numbered statements of fact – 25 of 54 of which the Colwells admitted in their entirety (A287-297) – all the arguments in those responses, as well as all of the

---

[9] The majority opinion thus discounted the well-reasoned arguments presented in the dissent as to the many reasons why expert testimony should be required to resolve causation questions involving accidental discharges of P320 pistols. *See Davis,* 126 F.4th at 1236-41 (Thapar, J. dissenting).

exhibits referenced therein, were included and relied upon in the Colwells' own counterstatement of undisputed material facts and briefing filed in opposition to Sig Sauer's motions, all of which the district court did consider. A287-385. Thus, there is no dispute that the district court took into account all of the alleged factual disputes upon which the Colwells sought to rely.

The Colwells further object to the district court's second statement in the same footnote, which correctly observed that their briefing before the district court "does not address the discrepancies between the reports of the incident and Michael Colwell's testimony." Appellant Br. at 34 (quoting A388, District Ct. Op. at 3 n.1). This argument is misplaced because, first and foremost, the district court's statement is accurate. The Colwells' briefing did fail to address these discrepancies and, instead, erroneously argued that the mere existence of evidence in the record that contradicts Mr. Colwell's account of the incident should be grounds to deny Sig Sauer's motion for summary judgment.[10] To the contrary, as discussed above, Tertin's and Vigilante's failure to address contradictory accounts of what occurred

_____

[10] A316, Pls.' Mem. in Supp. of Pls.' Opp. to Def. Sig Sauer, Inc.'s Mot. for Summ. J. at 19 ("Sig Sauer makes painstaking efforts to highlight what they believe are factual discrepancies in the testimony of Plaintiff and other witnesses regarding whether how the firearm discharged. While Plaintiff strongly believes Plaintiff's own testimony will be more reliable than an individual who arrived on the scene after the incident, the fact that Sig Sauer points to these factual issues prove the fate of its Summary Judgment.").

and failure to investigate the facts of this case to reconcile these accounts to inform their opinions, are centrally important to the district court's Rule 702 inquiry – and without competent expert testimony on defect and causation, the Colwells' claims fail as a matter of law.

Finally, the Colwells argue that their "response to Defendant's statement of undisputed material facts, that the district court failed to review or consider, includes factual responses and arguments regarding such reports." Appellant Br. at 43. In fact, the purported "factual responses and arguments" the Colwells point to are simply assertions which seek to discredit the EMS and police reports that contradict Mr. Colwell's testimony on the grounds that the responders who prepared those reports did not witness the incident. A288, Pls.' Resp. to Def. Sig Sauer, Inc.'s Statement of Undisputed Material Facts for Def.'s Mot. for Summ. J. at 2. As set forth in footnote 10, *supra*, however, the Colwells made the same unavailing argument in their summary judgment opposition briefing, which was considered and correctly rejected by the district court.

In sum, the Colwells fail to identify a single material fact or argument that the district court failed to consider, and in any event, none of those alleged "facts" or arguments in any way alter the sound reasoning of the district court in granting Sig Sauer's motions. *See Doe ex rel. Doe v. Whelan*, 732 F.3d 151, 157 (2d Cir. 2013) (affirming summary judgment in favor or defendants and reasoning, "[i]n sum,

55

notwithstanding the evidence plaintiffs claim the District Court overlooked or misconstrued, we readily conclude that the defendants are entitled to qualified immunity here.").

## <u>CONCLUSION</u>

The district court acted well within its discretion in concluding that the Colwells failed to establish that their experts' opinions met the admissibility requirements of Rule 702. In the absence of admissible expert testimony to establish causation, an essential element of all of the Colwells' claims, the district court properly granted summary judgment for Sig Sauer. Sig Sauer respectfully requests that this Court affirm those rulings.

Dated: May 15, 2025

<div style="margin-left:40%">

/s/ Robert L. Joyce
Robert L. Joyce
LITTLETON JOYCE UGHETTA & KELLY LLP
4 Manhattanville Road, Suite 202
Purchase, New York 10577
(914) 417-3400

– and –

Eric G. Lasker
Brett F. Clements
HOLLINGSWORTH LLP
1350 I Street NW
Washington, District of Columbia 20005
(202) 898-5800

*Attorneys for Defendant-Appellee*

</div>

56

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,855 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: May 15, 2025

<div style="margin-left:40%">

/s/ Robert L. Joyce

Robert L. Joyce

Littleton Joyce Ughetta & Kelly LLP

4 Manhattanville Road, Suite 202

Purchase, New York 10577

(914) 417-3400

    – and –

Eric G. Lasker

Brett F. Clements

Hollingsworth LLP

1350 I Street NW

Washington, District of Columbia 20005

(202) 898-5800

*Attorneys for Defendant-Appellee*

</div>

57

## ADDENDUM OF STATUTES, RULES, REGULATIONS

**Federal Rule of Evidence 702. Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

**Federal Rule of Civil Procedure 56. Summary Judgment**

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) Time to File a Motion. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c) , the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

(4) issue any other appropriate order.

(f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:

59

(1) grant summary judgment for a nonmovant;

(2) grant the motion on grounds not raised by a party; or

(3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

(g) Failing to Grant All the Requested Relief. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.

(h) Affidavit or Declaration Submitted in Bad Faith. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.